(No. 7117. March 17, 1944.)

THE.J. R. WATKINS COMPANY, a Delaware corporation, Respondent, v. ERNEST MELBERN CLARK, CHRIST H. FREES, GUSTAF LARSON, and CHARLIE E. JONES, Appellants.

[147 Pac. (2d) 348.]

James & James for appellants.

Chapman and Chapman for respondent.

GIVENS, J.—Respondent, a manufacturer and whole-saler of drugs, medicines, and sundries, entered into an agreement[1] with appellant Clark, August 31, 1938, whereby it agreed to sell and he agreed to purchase various merchandise which he was authorized thereby to retail in the locality where he was then engaged in business. The other appellants, as sureties or guarantors for appellant Clark, signed the appended agreement.[2]

[1]"IAO                               $1502.39                               2187

"THIS AGREEMENT, Made at Winona, Minnesota, this 31st day of August, 1938 between THE J. R. WATKINS COMPANY, a corporation, hereinafter called 'the Company,' and Ernest M. Clark of Shoshone, Idaho, hereinafter called 'the Purchaser,' witnesseth.

"1. That in consideration of the promises and Agreements of the Purchaser hereinafter contained, to be kept and performed by him, the Company agrees, unless prevented by fire, strikes, or other cause, to sell and deliver to the Purchaser, at its current wholesale prices, free on board cars at Winona, Minnesota, or at its option, at any of its other regular places of shipment, such goods and other articles manufactured or sold by it, as the Purchaser may reasonably require for sale, from the date hereof, until the first day of December, 1939, in the locality in which he is now engaged, or intends to engage, in business, a description of which locality he agrees to furnish and deliver to the Company in writing prior to its acceptance of this agreement; but the furnishing of such description may be waived by the Company at its election, without notice to the Purchaser or the sureties hereon.

"2. And in consideration thereof, the Purchaser agrees to buy from the Company the goods reasonably required by him as aforesaid; and agrees to furnish to it complete, regular, weekly, written reports, showing separately the amounts of his cash sales, time sales, and collections; which reports, however, or any of them, may be waived

January 8, 1940, respondent terminated the contract. At that time Clark was indebted to respondent in the amount of $2000.75. Merchandise was returned in the amount of $870, for which Clark was credited, leaving a balance of $1130.75, for which this suit was instituted.

The agreement between respondent and appellant Clark recited that at the date of its execution his then indebtedness under a previous similar contract was $1502.39. Appellants contended and testified that figure was not in the contract when they signed the surety addenda but the space therefor was blank. Various officers of the respondent corporation testified the amount was typewritten in the contract before appellants signed. The court submitted this issue to the jury, which found in favor of respondent.

Appellants' defenses are that this blank was not filled in and that being filled in by respondent constituted a material alteration to their detriment and voided their

by the Company without notice to the sureties hereon, and he also agrees to furnish a complete financial statement when requested to do so.

"3. The Purchaser further agrees to pay the Company its current wholesale prices for the goods and other articles sold to him, as herein provided, and also the prepaid transportation charges thereon, if any, by remitting to the Company each week at least sixty per cent (60%) of the amount received by him from his cash sales, and from his collections on sales previously made, at the time and in the manner and in accordance with the provisions of the weekly report blanks of the Company to be furnished to him; and, at the expiration or termination of this Agreement, to pay the whole amount therefor then remaining unpaid; or the Purchaser may pay for such goods in cash, less the usual cash discount allowed for such payments; but such payments, or any of them, may be waived or extended by the Company without notice to the sureties hereon, and without prejudice to the rights or interests of the Company.

"4. If the Purchaser shall not pay cash for said goods and other articles so sold and delivered to him, and the payments at the time and in the manner hereinbefore provided are insufficient to pay therefor, or if the Purchaser shall fail to pay on the indebtedness expressed herein, amounts satisfactory to the Company, from time to time during said term, the Company may, in its discretion, thereafter either limit the sales herein agreed to be made, or from time to time suspend the same, or require cash with each order, or cash upon

agreement; that after the date of the agreement respondent insisted upon appellant's purchasing an unwarranted amount of goods and extended an unreasonable credit, and that the court committed prejudicial error in refusing to submit this issue to the jury, it being their contention they were liable for only a "reasonable" amount of credit.

Various other errors are assigned, but they are all substantially disposed of by consideration of two propositions.

The surety agreement provided that if the amount of indebtedness was blank it could be filled in, without specifying by whom. Appellants rely upon *J. R. Watkins Co. v. Keeney*, 52 N.Dak. 280, 201 N.W. 833, 37 A.L.R. 1389, as holding that a creditor may not so fill in the blank but only the principal for whom the sureties have signed. The court there arrived at the restrictive conclusion by saying that it was the party to whom the instrument was delivered

delivery, until such indebtedness is, or such indebtednesses are, paid, or reduced, as the Company may require.

"5. The Purchaser may, within thirty days after the expiration or termination of this Agreement, return, by prepaid freight, to the Company, at Winona, Minnesota, Memphis, Tennessee, Newark, New Jersey, or Oakland, California, in as good condition as when delivered to him at point of shipment, any goods purchased by him from the Company, which he may then have on hand; and the Company agrees to repurchase such goods, if in such condition when received by it, and pay or credit the Purchaser therefor at the then prevailing wholesale prices. And, if any goods returned by the Purchaser are not in a salable condition when received by the Company at any of the places above named, the Company will restore them to such condition, if that can reasonably be done, and make a reasonable charge therefor, and deduct such charge from the value of such goods, and pay or credit the Purchaser with the balance. But the Purchaser shall not return, nor the Company pay or allow any credit for, any advertising matter of any kind, or for any goods or articles which have been used, or for any goods which cannot reasonably be restored to a salable condition.

"6. The Purchaser shall have no power or authority to make any statement or representation, or to incur any debt, obligation, or liability of any kind whatsoever, in the name of, or for, or on account of the Company.

"7. The Company shall have no interest in the accounts due for goods sold by the Purchaser; and no printed, advertising or other matter of the Company, sent to, or distributed by the Purchaser,

who had the right to so fill in. Even upon that premise the conclusion was wrong because the party to whom the agreement was delivered in the legal sense would be the obligee, not the principal. (50 C.J., Principal and Surety, p. 42, sec. 67[6], 38 C.J.S., Guaranty, p. 1160, sec. 21.) Delivery to the principal would be merely for transmittal to the obligee. Furthermore, no valid reason is given for the conclusion, and the comments in *J. R. Watkins Co. v. Williams*, 233 Ala. 135, 170 So. 194, rejecting the ruling

shall be construed to direct or control the sale or other disposition of said goods, or to change or modify the terms of this Agreement.

"8. It is also mutually agreed that this is the complete, entire and only Agreement between the parties, and that it shall not be varied, changed, or modified in any respect except in writing executed by the Purchaser and by an officer of the Company, and that either of the parties hereto may terminate this Agreement at any time, if desired, by giving the other party notice thereof in writing by mail.

"9. The Purchaser promises to pay the Company at Winona, Minnesota, from time to time, after thirty days from the date of acceptance of this Agreement, in amounts satisfactory to the Company, the indebtedness he now owes the Company, and agrees, at the expiration or termination of this Agreement, to pay any balance thereof then remaining unpaid, payment of which indebtedness is hereby so extended.

"10. The Purchaser and the Company, for the purpose of settling and determining the amount of the indebtedness now owing from the Purchaser to the Company, hereby mutually agree that the said indebtedness is the sum of Fifteen hundred two and 39/100 $\frac{\text{HIG}}{\text{FHW}}$ Dollars, which sum the Purchaser agrees to pay, and the Company agrees to receive, and payment of which is extended as above provided.

"IN WITNESS WHEREOF, The Company has caused these presents to be executed in its corporate name by its proper officer, and the Purchaser has hereunto set his hand the day and year first above written.

THE J. R. WATKINS COMPANY
By     Ralph G. Boalt
                V. President.
Purchaser sign
here with Ink     Ernest Melbern Clark
                Full Name, Not Initials"

[2]"In consideration of the execution of the foregoing Agreement by The J. R. Watkins Company, which we have read, or heard read, and

announced in *J. R. Watkins Co. v. Keeney*, supra, are logical and compelling. Many cases are cited by appellants in support of their proposition that the obligee may not fill in such a blank. None of them, however, are under contracts containing this permissive clause, hence, are not in point.

■ For two reasons, therefore, we must take as conclusive that this amount was in the contract at the time it was signed or permissibly inserted thereafter—first, because the issue was submitted to the jury and found in favor of the respondent; second, because of the terms and provisions of the surety agreement. Therefore, the surety appellants guaranteed the payment absolutely and unqualifiedly of $1502.39.

■ Appellants contend, however, that because credit was thereafter given which in a total amount exceeded the amount specifically guaranteed, the issue of reasonableness thereof should have been submitted. The amount sued upon, however, was less than the amount positively guaranteed.

---

hereby agree and assent to, and its promise to sell, and the sale and delivery by it, to the Purchaser, as vendee of goods and other articles, and the extension of the time of payment of the indebtedness owing by him to said Company, as therein provided, we, the undersigned sureties, do hereby waive notice of the acceptance of this Agreement, notice of default or nonpayment and waive action required, upon notice, by any statute, against the Purchaser; and we jointly, severally and unconditionally promise, agree and guarantee to pay said indebtedness, the amount of which is now written in said Agreement, or if not written therein, we hereby authorize the amount of said indebtedness to be written therein; and we jointly, severally and unconditionally promise to pay for said goods and other articles, and the prepaid transportation charges thereon, at the time and place, and in the manner in said Agreement provided. And we further severally agree that, in case of the death of one or more of us, the undersigned sureties, before the expiration or termination of this Agreement, the liability of the surviving surety, or sureties, shall continue until notice of the death of the deceased surety, or sureties, is given to the Company, at Winona, Minnesota, by registered mail.

SURETIES SIGN HERE IN INK

| Name | Occupation | Address |
|---|---|---|
| Christ H. Frees | Farmer | Dietrich, Idaho |
| Gustaf Larson | Farmer | Dietrich, Idaho |
| Charlie E. Jones | Farmer | Shoshone, Idaho" |

They cannot be heard to say that the amount they positively guaranteed was not reasonable. The goods delivered and for which credit was given subsequently to the signing of the contract obviously could not affect the indebtedness then existing; and the remittances made by appellant Clark, together with the returned goods, total $1852.10, which exceeded the merchandise received by him subsequent to the date of this contract by $371.64, which was applied on the indebtedness of $1502.39. Therefore, instead of being injured, appellants were benefited by this extension of credit, because the amount they had positively guaranteed, viz., $1502.39, was thereby reduced to the amount named herein, namely, $1130.75. The cases cited by appellants[3] as to the necessity of submitting the reasonableness of further credit to the jury did not consider a contract positively guarantying a definite, initial indebtedness, hence, are not in point.

We find support for the thought that respondent is entitled to recover the amount specified herein regardless of future credit, since it did not exceed the amount they guaranteed, in *Bank of America Nat. Trust & Savings Ass'n v. Sage*, 13 Cal. App. (2d) 171, 56 P. (2d) 565.

Conceding that the surety agreement is to be construed most strongly in favor of the guarantors, the pertinent language in *Cargill Commission Co. v. Swartwood*, 159 Minn. 1, 198 N.W. 536, at 540, on rehearing, leaves no room for construction or interpretation other than that without equivocation the amount of the indebtedness existing at the time the credit was made was accepted and guaranteed by appellant sureties. The refusal to submit the issue of reasonableness of additional credit, therefore, was correct. An instructed verdict in favor of respondent for $1130.75 should have been ordered. Consequently, the asserted errors in connection with the introduction of evidence concerning the second phase of the controversy need not be discussed.

Judgment affirmed, and costs awarded to respondent.

Holden, C.J., and Dunlap, J., concur.

AILSHIE, J., dissenting.—The following was written and submitted to my associates in January, with the thought

[3] J. R. Watkins Co. v. Jennings, 131 Okl. 295, 269 P. 265; Lehigh Coal & Iron Co. v. Scallen, 61 Minn. 63, 63 N.W. 245; Taney v. Hodson, 170 Minn. 230, 212 N.W. 196.

that it might become the opinion of the court. However, since the majority have reached a different conclusion, I am therefore filing this as expressing my own views of the case:

Respondent, the J. R. Watkins Company, a Delaware corporation, (hereinafter called the Company) brought this action against defendant Clark (hereinafter called the purchaser) and his sureties, (called the guarantors) for collection of balance due the company on a contract of guaranty, in the sum of $1,130.75. The cause was tried to the court and a jury; evidence was introduced by way of deposition; witnesses were sworn and examined. Default of defendant Clark was entered, verdict was rendered and judgment entered in favor of plaintiff in the above amount, from which judgment the guarantor defendants have appealed.

From April 7, 1936, to the end of 1939, Clark, as a salesman, residing at Shoshone, covered the territory of Lincoln and Blaine counties for the sale of the company's products. About every week Clark received through the mail printed circulars from the company, with instructions as to allowance of credit. In making the sales, Clark had on hand stock amounting to $300 or $400. The contract under which this action is brought was entered into August 31, 1938. In paragraph 10 thereof (in the third line) appear the following typed words, purporting to state a past due indebtedness: "Fifteen hundred two and 39/100 ——————— Dollars", followed by the letters written with pen and ink ("HIG" in blue ink and "FHW" in green ink). There is divergent testimony in regard to the writing in of these words in the contract. Clark testified that he "didn't" write in the figures and did not know whether they were written in or not at the time of signing the agreement.

Frees, a farmer residing over thirty-three years in Dietrich, one of the sureties who signed the agreement, testified that "there was a blank there" where the figures $1502.39 now appear. Gerrill Frees, a son, who was at home at the time his father signed the agreement, also stated that the figures did not appear in the paper at that time. Larson, another surety on the agreement, and also a farmer, gave the same testimony—"There was no figures there" nor initials inserted at the time he signed the paper; nor did he authorize anyone to fill in that amount. Jones, a farmer, and the third surety on the agreement, stated that, at the time of signing the instrument, the amount and the initials

following it did not appear therein; that he read the agreement before signing it.

As to the testimony of the witnesses for the company, taken on deposition: The assistant to the general manager, Mr. Henry, testified that the contract was "filled out on a typewriter on August 31, 1938, by the contract department of the plaintiff company here at Winona, Minnesota"; that the figures, $1502.39, were then typewritten in paragraph 10 of the agreement. A letter under the same date (Aug. 31, '38) was addressed to Mr. Clark, with the request that he "compare the amount in both places" with his books "and, if found correct, kindly sign the statement" at the bottom of the letter and to return the same to the company.

H. I. Greene, manager of the company's contract department, testified that the contract "was prepared by me and by my stenographer, Miss Irene A. Orlowske, under my direction and supervision, being filled out in a typewriter." The figures as above given were then typewritten in paragraph 10 as they appear now. Mr. Greene then "took the contract and verified the indebtedness" typewritten in the body of the contract, "to make sure it was the correct amount that Mr. Ernest Melbern Clark then owed the plaintiff." He then wrote his initials "HIG" with pen and ink in the space "at the right of this typewritten indebtedness in the body of this contract." The contract was then mailed to Mr. Clark. Miss Orlowske verified the above testimony by stating that she typed the contract on August 31, 1938; that she wrote in the figures, "1502.39", both "in the middle upper margin" and "then down in paragraph ten of this contract"; at that time there "were no names or signatures signed on it at all."

Mr. Walker, an assistant rural sales manager of respondent, testified to checking the indebtedness "set out in this contract at the time this contract was prepared and before it had been signed by any of the parties"; that, "of this prior indebtedness of $1,502.39", there was paid by a credit for returned goods, the sum of $371.64, "leaving the sum of $1,130.75 still unpaid." In regard to the other documents or agreements, he checked the indebtedness in each of them before either of them had been signed by anyone.

No question arises here as to the authority of the principal (Clark) to fill in the amount of the existing indebtedness—such was not done. The issue rather is, did the

creditor (respondent) fill in the amount after the guarantors signed the contract and if it did do so, did it have authority so to do? The verdict of the jury leads to the conclusion, that the jury believed the amount, ($1502.39) was inserted before the guarantors signed the contract of guaranty. Accepting that view of the case as must be done, under the evidence, we then have a severable two-part contract—first, a guaranty that the principal would pay the company the sum of $1502.39 past due; second, that the guarantors promise to pay for "such goods and other articles manufactured or sold by it, [the company] as the Purchaser may reasonably require for sale, from the date hereof, until the first day of December, 1939, in the locality in which he is now engaged, or intends to engage, in business."

The jury, having passed on this conflict of evidence and found, at least presumptively, in favor of the company on the issue of past due indebtedness, we dismiss that branch of the case without further consideration and turn our attention to the second question.

Specifications 1 and 2 are directed against the admission in evidence of plaintiff's Exhibits 88 and 91. Eighty-eight was a contract and agreement in similar form to the contract sued upon in this case and covered the year preceding the contract here involved. While Exhibit 91, to the same effect, covers the period immediately following the contract here involved. It is not perceived how these exhibits could be of any evidentiary value in proving the company's case. On the other hand, they might have confused the jury to appellants' prejudice. These exhibits should not have been admitted.

Specifications 3 and 4 go to the evidence offered by the witness, Clark. He was asked as a witness on behalf of defendants: ". . . what would you say would have been a reasonable amount of credit which you needed from the company?" The court ruled that this evidence was inadmissible.

We do not find any error in the court's ruling, since the question simply called for the *opinion of the man who had bought the merchandise* (as to whether or not this purchase was a reasonable one). The reasonableness of the purchases was a question for the jury to determine upon the facts and circumstances surrounding the transactions.

Another witness, Hanson, was called and testified that

he handled similar products for another company in adjacent territory, and that it was necessary for him to carry only about $300 worth of stock in order to conduct the business successfully; and that, *that, for him, was a reasonable amount to carry at any one time*. On motion, that evidence was later stricken and the action of the court is assigned as error. The evidence should have been allowed.

The "reasonableness" of the amount of credit extended can not ordinarily be proven by expert opinion but rather from the facts and circumstances of the business, the qualifications and experience of the debtor, locality, population to be served, and a multitude of incidental facts that would be taken into consideration by an average vendor in extending credit to a purchaser. The *guaranty* is for the protection of the vendor up to the point of unreasonableness of the credit, *beyond which point the vendor can no longer look to the guarantors* but assumes his own risk.

It was contended by appellants, that the company sent Clark "about every week", circulars and pamphlets in reference to extension of credit to prospective purchasers. Clark testified that, in moving from one town to another, the box or boxes containing this literature and these pamphlets were lost and that he had not been able to find any of the printed matter which he had received from the company through the mail. He thereupon offered to prove the contents of several of the documents. Objection was sustained to this, on the ground, that no notice to produce had been served on plaintiff, under sec. 16-403, I.C.A., which provides: That "If the writing be in the custody of the adverse party, he must first have reasonable notice to produce it." Appellants proved the *loss* of these documents and then offered to prove the contents of some of them, which they claimed was admissible within the purview of sec. 16-411, I.C.A. The ruling of the court, denying the proofs, was based upon the grounds that proper foundation had not been laid for the admission of secondary evidence, in that no demand had been made on the company for the originals. Like evidence has been held admissible. (*Taney v. Hodson*, 170 Minn. 230, 212 N.W. 196.)

It is argued by respondent, that the company had copies of all the documents and publications they sent out; and that they should have been given notice to produce before secondary evidence could be admissible. The answer to

respondent's contention is obvious, that *the documents,* contents of which it was proposed to prove, were not, so far as the proofs disclosed, in possession of the company, but rather had been lost. It may be true, that the company had duplicates of these documents. If the proof offered did not correspond with the documents sent, the company would have had a right to introduce its duplicates in evidence, by proving that they were duplicates of the documents mailed by it to the purchaser. In other words, it was within the power of the company to prove just what it did send the purchaser and to disprove any misstatements that the witness might make on the stand with reference to the contents thereof. It was error to reject the proffered testimony. (See, *Fairbanks v. Fairbanks,* 59 Ida. 1, 5, 80 P. (2d) 17.)

As heretofore observed, the amount of "goods reasonably required by" Clark was a major issue in the case and was a condition of the guaranty. The guarantors had a right to introduce evidence showing the locality in which the purchaser was stationed, the territory in which he had to confine his sales, his abilities as a salesman, and the nature and extent of the population and opportunities for transacting a considerable amount of business and the like. (*Taney v. Hodson,* 170 Minn. 230, 212 N.W. 196, and cases cited.)

It has been held that, *even though there is no limitation as to extent* of credit contained in a guaranty contract, nevertheless, a vendor is limited to the extent only of a *reasonable credit,* under the situation and circumstances surrounding the purchaser in order to bind the guarantors.

In *Lehigh C. & I. Co. v. Scallen,* 63 N.W. 245, the Supreme Court of Minnesota said:

"The question to be determined is, considering the language of the guaranty and all the circumstances of the case, was the amount of credit given unreasonable? The plaintiff might abuse its privileges even under this guaranty. If three or four hundred dollars was a reasonable line of credit in the business of E. F. Scallen, we are of the opinion that it was a question for the jury whether or not plaintiff did not so abuse its privileges under this guaranty in extending to him a line of credit amounting to $1,302, for which it now attempts to hold the guarantor. It will be noticed that this is not a question of what is a reasonable limit on the total amount of sales during the continuance of the guaranty, but what is a reasonable limit on the amount of

credit for which at any one time the guarantor can be held."

Here we have a contract limiting the guarantors' obligation to the payment only of "goods reasonably required by him", the purchaser. See, *Dillard v. Wilson,* 186 Ark. 503, 54 S.W. (2d) 294.

It is not enough to say that, since the amount still due on the total credits is less than the amount of the original debt guaranteed, therefore the guarantors are not injured or prejudiced. If it should be found that the credit extended under the guaranty was an unreasonable amount, under the condition and circumstance of the purchase, then it follows that Clark would have been just so much more able to keep up payments for the current purchases, had the excessive credit not been allowed.

According to the final statement of account rendered by the company, the company furnished Clark with $1480.46 worth of merchandise between the date of the execution of the contract and the 15th of March, 1939, during which time the purchaser accumulated $870.00 worth of stock. During the same period of time, Clark made payments in the sum of $982.10. Later he returned merchandise of the value of $870.

Clark's financial statement, made to the company October 18, 1938, showed his total assets as follows:

| "ASSETS | | LIABILITIES |
|---|---|---|
| Cash on Hand and in Bank, Value | $ 20.00 | |
| Accounts Due Me for Products sold on Time | $ 514.25 | |
| All Personal Property Value | $ 500.00 | |
| Wholesale Value of my Stock of Watkins Products—Value | $ 636.34 | I owe the J. R. Watkins Company $1,502.39 |
| TOTAL VALUE ALL MY PROPERTY | $1,670.59 | MY TOTAL LIABILITIES, ETC. $1,502.39" |

It will be seen from the foregoing, that during the period covered by the contract, the company shipped Clark merchandise for which they charged him $1,480.36. During the same time his unsold stock bought from the company had accumulated to the value of $870.00. Thus it appears that

the company profited at the expense of the guarantors in the sum of $1480.36; while, by the same transaction, the original indebtedness was reduced in only the sum of $22.03. The reasonableness of continued credit sales, under such circumstances, is certainly a proper question for consideration of the jury.

The authorities hold that the guarantor is entitled to stand on the strict letter of his contract; that a guarantor "is a favorite of the law", because his contract is merely an accommodation. (*Lamm & Co. v. Colcord*, 22 Okla. 493, 98 P. 355, 19 L.R.A., N.S., 901.)

1 Brandt on Suretyship, 3d ed., sec. 106, p. 230, says:

"A rule never to be lost sight of in determining the liability of a surety or guarantor is, that he is a favorite of the law and has a right to stand upon the strict terms of his obligation, when such terms are ascertained. This is a rule universally recognized by the courts, and is applicable to every variety of circumstances."

38 C.J.S., sec. 38, pp. 1180, 1181; 28 C.J., p. 935, sec. 80 (33), p. 936 (35); *Stone-Ordean Wells Co. v. Taylor*, 139 Minn. 432, 166 N.W. 1069, 1070, L.R.A. 1918E 93; *Cushing v. Cable*, 48 Minn. 3, 50 N.W. 891; *Simonson v. Thori*, 36 Minn. 439, 31 N.W. 861, 862; *Staver & Walker v. Locke*, 22 Or. 519, 30 P. 497, 17 L.R.A. 652, 29 Am. St. Rep. 621; 24 Am. Jur., p. 921, sec. 72; *People v. Buster*, 11 Cal. 215.

It has even been held, that a guarantor's "liability may not be extended by implication even though he would sustain no injury thereby or a change in the contract would be for his benefit." (38 C.J.S., p. 1183, sec. 38(d) and cases cited.)

Appellants requested the court to give the following instruction, which was denied:

"You are instructed, Gentlemen of the Jury, that if you find that the defendants, Christ H. Frees, Gustaf Larson and Charlie E. Jones, are liable on the contract of August 31, 1938, the amount of such liability cannot exceed the reasonable amount of credit which the defendant, Clark, was entitled to receive from the plaintiff, and as to what was a reasonable amount of credit is for you to determine from all the acts and circumstances in the case."

The court gave no instruction whatever on the subject of reasonableness of the amount of credit the company was authorized to extend to the purchaser under the guaranty. That was a material fundamental issue under the contract

and the issues made in the case. The jury should have been instructed as to the law on the subject. It was substantial prejudicial error to refuse to give the instruction.

The judgment should be reversed and a new trial granted.

Budge, J., sat at the hearing but did not participate in the decision in this case.