632 P.2d 683

**Earl F. McGILL, Plaintiff-Appellant,**

v.

**IDAHO BANK & TRUST CO., an Idaho Corporation, Defendant-Respondent.**

No. 13201.

Supreme Court of Idaho.

Aug. 13, 1981.

Bert L. Poole, Boise for plaintiff-appellant.

Mikel H. Williams, and Claire L. Dwyer of Collins, Manly & Williams, Boise, for defendant-respondent.

McFADDEN, Justice:

Plaintiff-appellant Earl F. McGill filed a complaint seeking restitution from defendant-respondent Idaho Bank and Trust (I B & T) in the sum of $1,722.88 for payments made to the bank and related expenses incurred under an assignment of a conditional sale security agreement. The bank counterclaimed for $5,177.92 allegedly owed to it by McGill for the balance due under the assignment of the conditional sale security agreement. Following the trial, the district court dismissed with prejudice McGill's complaint and entered judgment in favor of I B & T on its counterclaim. On appeal the judgment is affirmed.

McGill, is the successor in interest to S & E Enterprises, Inc. (S & E), a retail mobile home dealer. S & E entered into a "Dealer Reserve Agreement" with IB & T and began a business relationship in which the bank was to buy conditional sales contracts entered into between S & E and retail buyers. The dispute in the instant appeal arose from the sale of a mobile home by S & E to William J. Nyborg pursuant to a "Conditional Sales Security Agreement." S & E assigned the contract to the bank. Under the assignment S & E agreed to guarantee the payments of the buyer and that its liability as a guarantor would not be affected by any independent action of the bank relating to the principal obligation of the buyer.[1]

Nyborg subsequently defaulted on the contract. Defendant-respondent notified S

---

1. The language giving rise to this contractual relationship is contained in the document entitled "Assignment (Full Recourse)," and reads in full as follows:

"FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to IDAHO BANK & TRUST CO. hereinafter called the Bank, all right, title and interest of the undersigned in and to the above Security Agreement, the Goods therein described and all proceeds thereof, and hereby guarantees due and punctual payment of all sums due or to become due thereunder, and hereby consents that without further notice and without releasing the liability of the undersigned the holder of said Agreement may at its discretion give grace or indulgence in the collection of the same, grant extensions of time for

& E of the delinquency. S & E paid the delinquent payments and repossessed the mobile home. S & E then found another buyer for the mobile home, Derrold Clark. The sale to Clark was consumated by the execution of an instrument entitled, "Transfer of Interest Agreement." By the terms of this agreement, Clark was substituted as the purchaser under the Nyborg contract and assumed liability for the unpaid balance of the purchase price.

Clark became displeased with the mobile home and notified the bank that he wished to be released from the contract. Clark offered to allow the bank to repossess the mobile home with all of the furniture and improvements if the bank would agree to release him from all liability under the "Transfer of Interest Agreement" or under the original sales contract. It appears that bank representatives accepted Clark's offer and completely released him from all of his obligations under the "Transfer of Interest Agreement." The compromise entered into between Clark and the bank apparently was consumated without S & E's consent or knowledge.

The bank located a potential purchaser, Vern Shaver, and surrendered possession of the unit to him upon his agreeing to assume the payments for the mobile home under the terms of the previous contracts with Nyborg and Clark. Shaver assumed this contract by signing a "Transfer of Interest Agreement," identical in form to the one signed by Clark.

Shaver made payments on the contract until November 1976 when he defaulted.

At that time the bank approached McGill and informed him that they would hold him responsible under the "Full Recourse" provision of the contract assignment. It was not until this time that McGill became aware of the transfer to Shaver.

McGill then began making payments on the contract. Later, McGill inspected the mobile home and discovered the furniture had been removed as well as the carpets and the appliances. He also noticed that the wheels and axles had been taken, and that the mobile home was in a state of extreme disrepair. Following this inspection, McGill discontinued payments on the contract and thereafter filed this action.

The complaint filed sought restitution of $1,722.78 and an order declaring that McGill was released by the actions of the bank from all legal obligations under the written guaranty and full recourse assignment. The bank counterclaimed for the balance due under the assignment of the "conditional sale security agreement."

A trial was held on the issues raised in the complaint and counterclaim. At the conclusion of his case, McGill moved to amend the complaint to reduce the amount he was seeking from $1,722.78 to $1,244.70. Following the conclusion of the trial, the district court dismissed with prejudice McGill's complaint and entered judgment in favor of the bank. In so holding, the court ruled (1) the provisions of the original assignment authorized the bank to release Clark and substitute Shaver as the principal debtor without notice to McGill as guaran-

payment or performance of said Agreement either before, at or after maturity, increase or decrease the rate of interest. The undersigned warrants that the Agreement is genuine, that Buyer has capacity to contract, that title to the aforesaid property rests in the undersigned, that the undersigned has the right to make this assignment, that the aforesaid property is free from any lien and/or encumbrance and that all disclosures required by the Federal Truth in Lending Act have been made to Buyer in the proper manner.
The undersigned hereby waives (a) the right, if any, to the benefit of, or to direct the application of any security hypothecated to the Bank, until all indebtedness of the Buyer to the Bank, howsoever arising, shall have been paid; (b) the right to require the Bank to proceed against the Buyer, or to pursue any other remedy in the Bank's power, and agrees that the Bank may proceed against any of the undersigned directly and independently of the Buyer, and that the cessation of the liability of the Buyer, for any reason other than full payment, or the acceptance, release or substitution of security, or any impairment or suspension of the Bank's remedies or rights against the buyer, shall not in anywise affect the liability of any of the undersigned hereunder."

tor and still retain the right to collect their debt from McGill; and (2) the agreement authorizing these actions by the bank was enforceable against McGill. The court made no mention of McGill's claim for restitution aside from the statement that there was no allegation or evidence adduced at trial of bad faith, negligence on the part of the bank, adhesion, or other overreaching by the bank which would warrant equitable relief. McGill thereafter timely perfected the instant appeal.

Two issues are presented on appeal: (1) Did the language of guaranty in the original assignment of the conditional sale security agreement authorize I B & T to release the principal debtor and substitute another person without notice to McGill (the guarantor) and still retain the right to collect the balance of the partially satisfied debt from McGill; and (2) did the district court err in dismissing McGill's claim for restitution under the alternative theories that (a) the installment payments were made under duress, and (b) the payments were made under the erroneous belief that he was legally obligated to so act?

■ Turning to McGill's first issue, we note that it is a well-accepted rule of law that satisfaction of the principal debt or a release of the principal debtor discharges the guarantor. *Knight v. Cheek*, 369 A.2d 601 (D.C.App.1977); *First National Bank of Anthony v. King*, 2 Kan.App. 519, 583 P.2d 389 (1978); *Louisiana Bank & Trust Co. v. Boutte*, 298 So.2d 884 (La.App.1974), *amended and aff'd*, 309 So.2d 274 (La.1975); *Industrial Mercantile Factors Co. v. Daisy Sportswear, Inc.*, 56 Misc.2d 104, 288 N.Y. S.2d 209 (1967), *aff'd*, 56 Misc.2d 584, 289 N.Y.S.2d 332 (Sup.1968); *Eastman Oil Well Survey Co. v. Hamil*, 416 S.W.2d 597 (Tex. Civ.App.1967). Moreover, as a corollary of this rule of law, it has been stated in the Restatement of Security § 122 (1941)—which uses the words guarantor and surety interchangeably—that the burden is on the releasing creditor if he wants to retain his right of recourse against the guarantor.

"Where the creditor releases a principal, the surety is discharged, unless

(a) the surety consents to remain liable notwithstanding the release, or

(b) the creditor in the release reserves his rights against the surety."

*See Warner Lambert Pharmaceutical Co. v. Sylk*, 348 F.Supp. 1039 (E.D.Pa.1971) (applying Pennsylvania state guaranty law), *aff'd*, 475 F.2d 1398 (3d Cir. 1973); *United States v. Krochmal*, 318 F.Supp. 148 (D.Md.1970) (applying Maryland state guaranty law), *Maestro Music, Inc. v. Rudolph Wurlitzer Co.*, 88 Ariz. 222, 354 P.2d 266 (1960); *Fruehauf Trailer Co. of Canada Ltd. v. Chandler*, 67 Wash.2d 704, 409 P.2d 651 (Wash. 1966).

In this case, the principal concern of the court is whether the guaranty language in the assignment of the conditional sale security agreement effectively waives the guarantor McGill's defense of release. The pertinent language from the assignment is to the effect that McGill's predecessor in interest, S & E,

"[H]ereby guarantees due and punctual payment of all sums due or to become due thereunder . . . ."

"The undersigned hereby waives (a) the right, if any, to the benefit of, or to direct the application of any security hypothecated to the Bank, until all indebtedness of the buyer to the Bank, howsoever arising, shall have been paid; (b) the right to require the Bank to proceed against the Buyer, or to pursue any other remedy in the Bank's power, and agrees that the Bank may proceed against any of the undersigned directly and independently of the Buyer, and that the cessation of the liability of the Buyer, for any reason other than full payment, or any extension, forbearance, change or rate of interest, or acceptance, release or substitution of security, or any impairment or suspension of the Bank's remedies or rights against the buyer, shall not in anywise affect the liability of any of the undersigned hereunder."

■ In interpreting this language, the court is mindful of the well-settled rule that guaranty agreements are to be construed strongly in favor of the guarantor. *Indus-*

*trial Investment Corp. v. Rocca*, 100 Idaho 228, 596 P.2d 100 (1979); *J. R. Watkins v. Clark*, 65 Idaho 504, 147 P.2d 348 (1944). However, the court is also mindful of the equally well-settled rule that where the language in the guaranty agreement is unequivocal, the agreement must be interpreted as a matter of law according to the language employed therein. *Industrial Investment Corp. v. Rocca, supra; Commercial Credit Corp. v. Chisholm Bros. Farm Equip. Co.*, 96 Idaho 194, 525 P.2d 976 (1974).

The district court concluded in its memorandum decision that the above quoted language of guaranty contained in the assignment "insuring the liability of the guarantor regardless of the liability of the Buyer contemplates actions of the bank affecting such liability as well. There can be little doubt that this all-inclusive language embraces the situation before the court." Based on the cases of *Fruehauf Trailer Co. of Canada, Ltd. v. Chandler*, 67 Wash.2d 704, 409 P.2d 651 (1966), and *United States v. Beardslee*, 562 F.2d 1016 (6th Cir. 1977) *cert. denied*, 439 U.S. 833, 99 S.Ct. 113, 58 L.Ed.2d 128 (1978), the district court then concluded that the language of guaranty in the instant case is enforceable and waives McGill's defense of release.

Admittedly, neither of the two cases relied upon by the district court involved a creditor unilaterally substituting the principal debtor with another debtor unknown to the guarantor and without his consent. However, the two cases nevertheless support the district court's conclusion that a contractual provision constituting a full and complete waiver by the guarantor of the defense that the principal debtor had been released is enforceable. In *Fruehauf, supra*, several shareholders guaranteed a conditional sales security contract purchase of twelve trailers from the plaintiff, Fruehauf,

to their corporation, Pacific Inland Express, Ltd. (PIX). The guaranty agreement read in pertinent part: "The liability of the undersigned for performance of the above-mentioned terms shall not be affected by any indulgence, compromise [or] settlement . . . by Fruehauf to PIX or by the discharge or release of any obligation of PIX." PIX subsequently defaulted, Fruehauf repossessed the trailers, and then discharged PIX from its obligation. 409 P.2d at 653. Fruehauf thereafter brought an action against the guarantors. While acknowledging that when the obligation of the principal has been released and discharged, the liability of the guarantors is likewise extinguished, Fruehauf argued that the guarantors had explicitly waived their right to this defense by virtue of the above quoted language from the guaranty agreement. The trial court rejected the argument, but on appeal the Washington Supreme Court reversed, finding the guaranty agreement enforceable and binding on the parties.

"In clear and unambiguous terms, the guaranty agreement waived the defense of release or discharge . . . we hold that the . . . agreement constituted a full and complete waiver by the guarantors of the defense that the principal obligation had been discharged." 409 P.2d at 654.

*See also, Knight v. Cheek*, 369 A.2d 601 (D.C.1977). *See generally, United States v. Cawley*, 464 F.Supp. 189 (E.D.Wash.1979), *Illini Fed. Sav. & Loan Ass'n v. Childers*, 88 Ill.App.3d 1124, 44 Ill.Dec. 204, 411 N.E.2d 110 (1980); *Nat'l Bank of North America v. Kory*, 63 A.D.2d 579, 404 N.Y.S.2d 626 (1978); *Franklin Bank v. Skeist*, 49 A.D.2d 215, 373 N.Y.S.2d 869 (1975). Similarly, in *Beardslee, supra*, the court interpreted similar language of guaranty contained in a Small Business Administration loan agreement.[2] The court held that, as a matter of

2. The guaranty agreement, S.B.A., Form 148, reads in pertinent part as follows:

"The undersigned waives any notice of the incurring by the Debtor at any time of any of the liabilities, and waives any and all presentment demand, protest or notice of dishonor, nonpayment, or other default with respect to

any of the liabilities and any obligation of any party at any time comprised in the collateral. The undersigned hereby grants to Bank full power, in its uncontrolled discretion and without notice to the undersigned, but subject to the provisions of any agreement between the debtor or any other party and

federal law, the guarantors had waived their defense of release of the principal obligor, "based upon a reasonable interpretation of the clear and unambiguous language contained in [S.B.A.] Form 148." 562 F.2d at 1023. *See also, Victory Highway Village, Inc. v. Weaver*, 480 F.Supp. 71 (D.Minn.1979).

McGill contends that the language of guaranty in the assignment does not contain any provision constituting a full and complete waiver of his defense that the principal debtor had been released. Specifically, McGill emphasizes that there is no provision explicitly authorizing I B & T's actions in this case, i. e., unilaterally releasing the principal debtor and substituting another party, unknown to the guarantor and without his consent. The absence of such a provision is not dispositive to this case given the sweeping language in the assignment regarding the guarantor's liability.

The language of guaranty in the assignment is explicit: the liability of the guarantor shall continue even though the buyer's liability has ceased for any reason other than full payment and even if there has been (1) an extension, forbearance or change in the rate of interest, or (2) an acceptance, release or substitution of security, or (3) an impairment or suspension of the bank's remedies or rights against the buyer. The language is all-embracing and contemplates that unless there has been full payment resulting in the cessation of the principal debtor's liability, guarantor McGill shall nevertheless remain liable. Moreover, the guarantor's liability continues even if one of the three enumerated circumstances occur; occurrences which would normally extinguish the guarantor's liability. Thus rather than affirmatively providing for a waiver of guarantor, McGill's defense of release of the principal debtor, the language of guaranty in the assignment effectively

provides for waiver by way of negating the defense.

Based upon the above discussion, we hold that the district court properly ruled as to the effect to be given the language of guaranty contained in the assignment, i. e., McGill had contractually waived his defense of release of the principal debtor.

The second issue presented on appeal is whether McGill is entitled to restitution of the installments paid at I B & T's demand under the alternative theories that (a) the monies were paid under threat of lawsuit arising to the level of duress, or (b) the monies were paid under the erroneous belief that he was legally obligated to make such payments. Neither theory is supported by the record.

■ Pertinent to McGill's first theory is § 71 of the Restatement of Restitution, which states in part:

"(1) A person who has conferred a benefit upon another in response to the institution or threat of civil proceedings against him by the other . . .

(b) is not entitled to restitution merely because the other has begun or threatened to begin civil proceedings against him."

According to Comment (b) of § 71, such a threat does not arise to the level of duress made in good faith and unaccompanied by other oppressive circumstances. In the instant case, there was no evidence adduced at trial which suggests that I B & T's threat of legal action was made in bad faith or accompanied by other circumstances warranting equitable relief.

■ As to McGill's alternative theory in support of restitution, the general rule is that absent fraud, undue influence or other inequitable conduct by the party against whom relief is sought, a court will not grant equitable relief for a mistake of law with full knowledge of the relevant facts.

Bank at the time in force, to deal in any manner with the Liabilities and the collateral, including, but without limiting the generality of the foregoing, the following powers:
(a) To modify or otherwise change any terms of all or any part of the Liabilities or the rate

of interest thereon . . . to grant any extension or renewal thereof or any other indulgence with respect thereto, and to effect any release, compromise or settlement with respect thereto."

*Brady Township v. Ashley*, 17 Pa.Cmwlth. 226, 331 A.2d 585 (1975); *Metropolitan Development & Housing Agency v. Hill*, 518 S.W.2d 754 (Tenn.App.1974). *See generally*, 27 Am.Jur.2d, Equity §§ 36, 37 (1966). Although the modern trend of authority recognizes many exceptions to the general rule, these exceptions are invoked only where necessary to prevent injustice or unconscionable advantage. *Id.* Since there was no fraud, undue influence or other inequitable conduct on the part of I B & T, alleged or proved below, equitable relief is not warranted in this case.

Judgment affirmed. Costs to respondent. Respondent's request for attorney fees on appeal is denied.

BAKES, C. J., and DONALDSON, J., concur.

BISTLINE, Justice, dissenting.

## I.

It is a matter of common knowledge that sellers of consumer goods such as cars and mobile homes cannot finance their inventories by themselves and that they must resort to banks for financing. Similarly, on time sales such sellers are unable to carry the paper, and necessarily resort to banks and credit corporations for that purpose. In the ordinary case the seller, his buyer, and the firm who will carry the paper are all involved in the transaction—which ordinarily results in seller assigning the paper to the financing concern. As a matter of common practice banks and other financing entities retain full recourse against the sellers, and over the years this has been understood and accepted.

It must be remembered that behind this type of security arrangement there stand three parties—the seller-guarantor, the buyer and the bank. The bank, of course, wants to protect itself against all eventualities. The seller's *only protection* is that he approves the buyer, whom he believes to be a good risk, and whom he believes will make the payments and not ransack the security. Sometimes, of course, the buyer will default, and the bank can demand that the guarantor take the paper back. This is not what happened in the present case, however. Instead I B & T acquired a replacement buyer, someone of whom McGill had neither knowledge nor an opportunity to disapprove.[1] Under the Court's rationale, I B & T could have transferred this interest to the twelve year old son of I B & T's president, never informed McGill, and subsequently demanded full redress from McGill. McGill guaranteed only the contract made with the buyer which he had approved. Indeed, the "Assignment (Full Recourse)" document states that "[t]he undersigned [the guarantor] warrants ... that Buyer has capacity to contract ...." A guarantor so warranting that the buyer has capacity to contract obviously has in mind a particular buyer, and nothing in the agreement between seller and the bank authorized the bank to obtain and substitute an entirely new buyer unknown to and unwarranted by the seller.

In fact, if there were a provision in this contract which allowed I B & T to substitute buyers at will, such might well violate public policy. A bank should not be allowed to use its superior bargaining position to place a seller wholly at the bank's unfettered mercy. Equity and good conscience require that the bank should at least in the first instance return the paper to the guarantor, who ultimately is responsible for the payments, and who is the party most desir-

---

1. Some of the facts of this case should be highlighted. It was early 1975 when Clark first expressed dissatisfaction with the trailer. In September 1975 I B & T released Clark and transferred the home to Shaver. Neither McGill nor Clark signed this transfer agreement and, although McGill frequented I B & T weekly, no notice of this action was given to him. Shaver subsequently defaulted in the fall of 1976, after which McGill was finally notified of the transfer. The reading I B & T wishes to put on this contract is that it was free to release the debtor at any time, give the trailer to someone else, never inform McGill of these actions and, after the passage of sufficient time for the trailer to vanish, obtain full payment from McGill. There is no such provision in this contract, and to read such a provision into it contravenes all known principles of both law and equity.

ous of finding a new buyer thought to be satisfactory. Allowing the bank unlimited authority to pick an irresponsible buyer who may destroy the security removes any protection the guarantor may have had, and might well be an unconscionable provision. It is unnecessary to address this broader question of public policy here, however, for the contract in this case did not provide that the bank could substitute buyers at will, or at all. In fact, I have been unable to find any contract purporting to do so. A seller who would sign such a contract would be an idiot. A financing concern attempting to extract such a condition would be a Scrooge. In the instant case the bank did not attempt to utilize such a contract.

## II.

The dispositive question in this case can be simply phrased: Does the assignment contract provide that I B & T can release and substitute debtors without notice to McGill such that McGill would still be liable as guarantor? In my view it does not. Further, the contracts in the cases cited by the Court show only how a contract can be written to provide for the *release* of the buyer, to be presumably followed by a return of the paper to the guarantor. Not only does the contract in the present case fail to provide for a *release* of the *buyer*, but none of the contracts in the cases cited by the court provide, or likely could provide, for *substitution* of *buyers* by the bank.

The Court quotes the following language as being that pertinent here:

"[McGill] hereby guarantees due and punctual payment of all sums due or to become due thereunder . . .

. . . .

The undersigned hereby waives (a) the right, if any, to the benefit of, or to direct the application of any security hypothecated to the Bank, until all indebtedness of the Buyer to the Bank, howsoever arising, shall have been paid; (b) the right to require the Bank to proceed against the Buyer, or to pursue any other remedy in the Bank's power, and agrees that the Bank may proceed against any of the undersigned directly and independently of the buyer, and that the cessation of the liability of the Buyer, for any reason other than full payment, or any extension, forebearance, change or rate of interest, or acceptance, release or substitution of security, or any impairment or suspension of the Bank's remedies or rights against the Buyer, shall not in anywise affect the liability of any of the undersigned hereunder."

The first quoted sentence merely states that McGill agrees to guarantee payment, and is not relevant to the question here. Subsection (a) of the second sentence states only that McGill waives any right "to direct the application of any security." This can in no way be read as conferring on I B & T the power to release the debtor, substitute a new buyer, and still hold McGill liable; directing the application of the security does not concern release or discharge of the debtor. Subsection (b) of the second sentence is the key here, and that subsection must be read in its entirety in order to properly understand it. The purpose of that subsection, as evidenced by the first two phrases—"the right to require the Bank to proceed against the buyer, or to pursue any other remedy in the Bank's power"—is to relieve I B & T of any responsibility to pursue a remedy against the buyer. There is no subsection (c) providing that the bank may release the buyer, much less substitute a new buyer; the rest of subsection (b) simply expands on the central purpose of this subsection by providing that if in some event I B & T should not have a remedy against the buyer, McGill would still be liable. I would view this further language as McGill does, that it was meant to cover instances where the buyer's liability was terminated by virtue of circumstances beyond the creditor's control, e. g., the buyer's discharge in bankruptcy, avoidance of liability due to incapacity to contract by reason of age, insanity, mutual mistake, fraud, statutes of limitations or other principles of equity or law permitting avoidance of the contract obligation by the buyer. The closest that language comes to providing that I B & T may release a debtor is

where it states "or any extension, forebearance, change or rate of interest, or acceptance, release or substitution of security, or any impairment or suspension of the Bank's remedies or rights against the buyer . . . ." The first part of this phrase does not state that I B & T can release the debtor; it states that I B & T can release or substitute *security*. The rest of the phrase—"or any impairment or suspension of Bank's remedies or rights against the Buyer"—does not provide that I B & T may release buyers; it provides for the eventuality of I B & T for some reason losing its rights against the buyer. That is not the same as releasing a debtor. Certainly it is not a promise to guarantee, sight unseen, any *new* buyer I B & T may come up with. As the Court notes, it is well settled that guaranty agreements are to be construed strongly in favor of the guarantor. With or without application of that principle, I cannot agree that this language provides that I B & T can release and substitute debtors without notice to McGill and continue to hold McGill liable as guarantor.

An examination of the cases cited by the Court illustrates how this clause should have been written had I B & T wished to retain the ability even to *release* debtors without notice to McGill; those cases neither rely upon agreements which specifically provide for *substitution* of debtors nor do they provide any support for a holding that such can be done. In *Fruehauf Trailer Co. of Canada, Ltd. v. Chandler*, 67 Wash.2d 704, 409 P.2d 651 (1966), the contract stated that the guarantee "shall not be affected by any . . . comprise, settlement, . . . or by the discharge or release of any obligation of PIX . . . ." *Id.* at 652. As noted by that court, this language specifically gave Fruehauf the right to release the debtor without affecting the guarantee, and this language therefore constituted a full and competent waiver of the defense that the principal obligation had been discharged. While *Fruehauf* did hold that the guarantors were liable notwithstanding the release of the debtor, it did not hold that Fruehauf (which is not an assignee bank) could run in a ringer, and still hold as guarantors the party or parties who had guaranteed the contract of a specifically designated buyer.

Similarly, in *United States v. Beardslee*, 562 F.2d 1016 (6th Cir. 1977), the contract gave the bank full power "[t]o modify or otherwise change any terms . . . of the Liabilities . . . and to effect any release, compromise or settlement with respect thereto." *Id.* at 1019. Again, the bank was given full explicit authority to effect any release, but it was given no power to substitute debtors.[2] Here not only is there no provision for substitution of debtors, *there is also no provision even for the release of a debtor by the bank.*

The Court is correct when it states that the contract provides that the liability of the guarantor continues "even if there has been (1) an extension, forebearance or change in the rate of interest, or (2) an acceptance, release or substitution of security, or (3) an impairment or suspension of the bank's remedies or rights against the buyer." The contract provides no more and no less; the Court, however, would read much more into the contract than is there. The language, in spite of the Court's assertion to the contrary, is far from "all-embracing." There is no clause in the contract which provides that McGill will remain liable under *any and all* circumstances. Instead, the contract specifically lists those instances where McGill will remain liable; release and substitution of buyers is not in that listing. The Court's statement that "the language of guaranty in the assignment effectively provides for waiver by way of negating the defense" can only be described as gobbledygook. The issue here is whether McGill has specifically agreed to remain liable if the bank releases and substitutes debtors without notice to McGill. The Court is unable to point to any language in the contract to that effect. There is no such language.

---

2. It would serve no purpose beyond lengthening this opinion to set forth the other cases referred to by the Court. None supports the Court's position any more than the above two, and, since the Court does not deign to discuss any of the others, I, too, will abstain.

The contract form here was prepared by I B & T, and if I B & T had wished to insert·a clause stating that it could release a debtor, it certainly could have done so with ease. All it needed to do was state that it could release the debtors without notice and without affecting the obligation of guarantor. I B & T did not do so, choosing instead to retain only the power to *release* the *security*. Moreover, if I B & T wished to write in a provision giving it the power to substitute debtors in the hopes that such would not be found to be void, it could also have easily done that. But it did not do so. The provision which the Court now reads into the contract provides an additional, unbargained-for benefit to I B & T. Conversely, it imposes upon McGill a burden which he did not assume when he signed the contract; the lack of notice of release and substitution, and the release itself, clearly deny McGill remedies over against a buyer—remedies which would otherwise be available. The Court in so doing is clearly guilty of denying McGill due process of law. This is a dangerous precedent. I dissent.

SHEPARD, Justice, dissenting.

The majority correctly sets forth the facts and to a large extent is correct in its recitation of the applicable law. However, I am convinced that the majority seriously errs in its application of law to the established facts.

I believe the majority correctly characterizes McGill as a guarantor. The majority correctly recites the "well settled rule" that guaranty agreements are to be construed strongly in favor of the guarantor.

Here McGill (S & E) entered into a contract with Nyborg for the sale of a trailer. As security for Nyborg's performance of the contract, McGill retained a security interest in the trailer. McGill thereafter assigned his rights in that Nyborg contract to I. B. & T., and as the majority correctly points out, thereby became a guarantor of Nyborg's obligation. Under the usual rule of law, if I. B. & T. had released Nyborg from his liability under the contract, McGill, as guarantor, would also have been dis-charged from his liability. However, McGill had expressly contracted with I. B. & T. that he would remain liable to I. B. & T. although I. B. & T. had released Nyborg from liability. Following the bank's release of Nyborg, one Clark was substituted in place of Nyborg, with Clark taking possession of the trailer and becoming responsible for Nyborg's obligation. Such was accomplished by a "Transfer of Interest Agreement," which was participated in by McGill and in which he agreed to the transfer, guaranteed Clark's obligation to the same extent that he had guaranteed Nyborg's obligation and, of course, consented to Clark's possession of the trailer which stood as security for the Nyborg-Clark obligations.

Hence, when Clark defaulted on his obligations under the conditional sales contract and redelivered the trailer to I. B. & T., McGill was liable under his guaranty of Clark's obligation and remained obligated to I. B. & T. for the monies remaining due under the conditional sales contract. Had I. B. & T. demanded those monies from McGill at that point in time, it would and should have been successful in a recovery. However, that I. B. & T. did not do. Rather, without consent or any notification to McGill, it and it alone entered into an agreement with a third party, Shaver, and turned possession of the security, i. e., the trailer, over to Shaver. Insofar as the record demonstrates, McGill was not even aware of the existence of Shaver, much less was he a party to that contract. The record is absolutely devoid of any indication whatsoever that McGill consented to the delivery of the security to Shaver or in any way indicated he intended to be a guarantor of the contract between Shaver and I. B. & T.

It is clear to me at least that "[A] guarantor, like a surety, has been held to be a favorite of the law and his liability is not to be extended by implication beyond the express limits or terms of the instrument, or its plain intent." *Industrial Investment Corp. v. Rocca*, 100 Idaho 228, 233, 596 P.2d 100, 105 (1979). Further, I believe it clear that a guarantor will be released from fur-

ther liability by a change in the principal debtor or obligor unless he consents thereto. 38 C.J.S. *Guaranty* § 71 (1943). *See Mountain States Telephone & Telegraph v. Lee*, 95 Idaho 134, 504 P.2d 807 (1972). I believe it further clear that a creditor may not permit or participate in the destruction or reduction in value of the security without the consent of the guarantor and then look to the guarantor for the entire amount of the indebtedness. *See Industrial Investment Corp. v. Rocca, supra; Universal C.I.T. Credit Corp. v. Whitworth*, 77 Idaho 528, 296 P.2d 712 (1956).

As pointed out above, in the instant case there was no showing that McGill intended to nor did he expressly or by implication guaranty Shaver's performance of the agreement between Shaver and I. B. & T. Further, the value of the security, *i. e.*, the trailer, was seriously diminished as a result of I. B. & T. turning over possession of the trailer to Shaver.

I find nothing in *U. S. v. Beardslee*, 562 F.2d 1016 (6th Cir. 1977), or *Fruehauf Trailer Co. of Canada, Ltd. v. Chandler*, 67 Wash.2d 704, 409 P.2d 651 (1966), which furnishes any authority for the case at bar. Although both those cases contained similar language in the guaranty instrument, such language only continued the liability of the guarantor when defaulting debtors were released from liability. No language nor facts in those cases indicate that a creditor may unilaterally substitute a new debtor unknown to the guarantor and without his consent and still continue the guarantor's liability.

I would reverse.