74 P.3d 268

**DATA SALES CO., INC., a Minnesota corporation, Plaintiff–Appellee,**

**v.**

**DIAMOND Z MANUFACTURING, an Idaho corporation, Defendant–Appellant.**

**No. 1 CA–CV 02–0480.**

Court of Appeals of Arizona, Division 1, Department B.

Aug. 14, 2003.

---

Quarles & Brady Streich Lang L.L.P. by Charles W. Herf, Brian R. Booker and Nicole France, Phoenix, Attorneys for Plaintiff–Appellee.

Snell & Wilmer L.L.P. by Joel P. Hoxie, Martha E. Gibbs and Todd A. Williams, Phoenix, Attorneys for Defendant–Appellant.

## OPINION

IRVINE, Judge.

¶ 1 Diamond Z Manufacturing appeals from the trial court's order denying its request to set aside the judgment finding Diamond Z liable under a guaranty agreement. We find that surety defenses can be expressly or implicitly waived within the guaranty contract. Therefore, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Diamond Z is an Idaho corporation that manufactures recycling equipment known as tub grinders. Tub grinders are large industrial machines designed to grind solid materials such as tires, stumps, logs, and railroad ties, into small pieces one inch or less in size. In 1993, Zehr Wood & Tire Grinding, Inc. ("Zehr Wood") purchased a Model 1463T tub grinder, the largest model manufactured by Diamond Z. Vernon and Rodney Zehr, father and son, owned and operated Zehr Wood. Vernon and Rodney are the uncle and cousin,

respectively, of Marty Zehr, an owner of Diamond Z. At the time Zehr Wood purchased the tub grinder, Diamond Z neither received nor requested anything in writing from Zehr Wood and Zehr Wood made no written commitment to make scheduled payments for the grinder. The approximate purchase price of the tub grinder was $425,000. As of December 1996, Zehr Wood still owed a balance of $375,000 on the grinder's purchase price.

¶ 3 Data Sales Company, Inc. finances and leases equipment. Equipment Leasing Corporation ("ELC") often brokers these transactions. ELC finds a proposed lessee or buyer and then submits the deal to Data Sales for financing. If Data Sales approves the deal, the buyer or lessee signs the appropriate documents with ELC, and the documents are then assigned to Data Sales, which funds the transaction. Data Sales and ELC have done several financing transactions with Diamond Z, its affiliates, and Zehr family members.

¶ 4 On December 5, 1996, Zehr Wood and ELC entered into a purchase/leaseback transaction in which Zehr Wood sold the grinder to ELC for the outstanding balance due to Diamond Z ($375,000), and ELC leased the tub grinder back to Zehr Wood. The terms and conditions of the purchase/leaseback transaction were set forth in a Master Lease Agreement for Equipment ("the lease"). The lease required 42 monthly payments of $11,844, with total payments over the life of the lease of $497,448. As part of the transaction, ELC required Diamond Z to execute a Continuing Corporate Guaranty ("the guaranty") guaranteeing Zehr Wood's payment obligations under the lease. Diamond Z's general counsel Alan Malone reviewed the guaranty. On December 5, 1996, Diamond Z executed the guaranty in the form ELC requested. Under the guaranty, Diamond Z agreed that it was fully conversant with the financial status and situation of Zehr Wood at the time it signed the guaranty. Diamond Z also agreed that Data Sales had no duty to disclose to Diamond Z any facts or information it may acquire about Zehr Wood.

¶ 5 Data Sales provided the funding for the transaction and transferred the funds directly to Diamond Z. On December 6, 1996, ELC, as lessor, assigned all of its interest in the lease with Zehr Wood to Data Sales. ELC and Data Sales also required Rodney Zehr to personally guarantee the debt.

¶ 6 Within weeks after signing the lease, Rodney and Vernon Zehr informed Data Sales that they wanted out of the grinding business. Marty Zehr was also aware of Rodney's and Vernon's desire to leave the grinding business. In October 1996, prior to signing the lease, Rodney had contacted Global Intermark ("Global"), an equipment broker in Missouri. On December 3, 1996, Zehr Wood entered into a marketing contract with Global, wherein Global agreed to find a party interested in acquiring the tub grinder. Shortly thereafter, Global located a party who was interested in acquiring the grinder, Breaux Bridge Resources, Inc. ("Breaux Bridge"), located in Shreveport, Louisiana.

¶ 7 In January 1997, Data Sales, Zehr Wood, and Breaux Bridge executed an assignment of the lease. Zehr Wood remained obligated for the full amount of the lease. At that time, Zehr Wood had already made the January lease payment. Zehr Wood was not in default under the lease at the time of the assignment.

¶ 8 Breaux Bridge made only three lease payments to Data Sales, all of which were late. On May 21, 1997, Data Sales sent a formal default notice to Breaux Bridge. Data Sales did not copy Diamond Z on this notice, nor did Data Sales ever contact Diamond Z with regard to Breaux Bridge's default at the time. Data Sales initially sought payment from Breaux Bridge. Breaux Bridge filed for bankruptcy on October 2, 1997. Data Sales was not able to collect from Rodney Zehr because he filed for bankruptcy.

¶ 9 In February 1999, Data Sales brought suit against Diamond Z, Zehr Wood, and Rodney Zehr. Zehr Wood and Rodney Zehr never answered or appeared, and were ultimately dismissed from this case.

¶ 10 Diamond Z moved for summary judgment, asserting that the assignment of the lease agreement to Breaux Bridge without its knowledge or consent constituted a modification of the underlying obligation and therefore wholly discharged Diamond Z's obligations under the guaranty. Data Sales responded by filing a cross motion for partial summary judgment, asserting that under the language of the guaranty, Diamond Z consented in advance to modifications to the lease agreement and therefore waived its right to the modification/discharge defense.

¶ 11 The trial court denied Diamond Z's motion for summary judgment and granted Data Sales' motion for partial summary judgment. The court found that the lease assignment modified Diamond Z's guaranty obligations to its detriment, without its consent or knowledge, and under *Indian Village*,[1] "Diamond Z would be discharged from liability on the guaranty." Nevertheless, the trial court found that the express language of the guaranty allowed Data Sales to modify the lease without notice and Diamond Z's consent and that Diamond Z consented in advance to the modifications. Accordingly, Diamond Z had waived its right to assert the surety discharge defense.

¶ 12 Diamond Z filed a motion for reconsideration, asserting that factual issues regarding its intent to waive its right to discharge precluded summary judgment in favor of Data Sales. Initially, the trial court denied relief, stating that:

In the Court's view, there would be basic unfairness if the law allowed a significant change in the position of a guarantor without the guarantor's consent. However, in this case, it appears that the consent was given in advance. A right of substitution and a right of amendment was expressly granted. That right was exercised. In the absence of contract provisions permitting such a change, the Court would hold that the change was a discharge of the guarantee obligation. However, here, advance consent, while somewhat unpalata-ble, does not seem to be unconscionable or against public policy.

Diamond Z filed a supplemental memorandum, asking the court to consider extrinsic evidence of Diamond Z's intent before determining whether Diamond Z had waived its right to discharge. Furthermore, Diamond Z asserted that under Restatement (Third) of Suretyship & Guaranty § 48 (1996) ("Restatement"), it could not consent in advance to material modifications of the lease as a matter of law. The trial court modified its previous rulings and ordered a limited trial regarding "the parties' intent and their reasonable expectations" under the contract.[2] The trial court reasoned that because Restatement § 48 addressed waiver of only certain surety defenses, "[i]t can be read as excluding defenses (rights) like the *Indian Village* defense." Further, the court found that "the intent of the parties and their reasonable expectations, even if contrary to the expressed 'contract' intent, are important in this case."

¶ 13 At trial, both parties presented evidence to the jury establishing the parties' intent at the time they formed the contract. Diamond Z moved for judgment as a matter of law and for a directed verdict, both of which the court denied. The jury found the following:

1. That Diamond Z and E.L.C. *did intend* for Diamond Z to waive its rights to notice and to consent to [an assignment of the lease agreement.]

2. That Diamond Z and E.L.C. *did intend* that such waiver of rights would apply even if Zehr Wood was not in default.

3. That Diamond Z did not have a reasonable expectation that its guaranty could not be enforced against it if it did not get notice of and a chance to object to [an assignment of the lease agreement] and that Diamond Z did not have a reasonable expectation that its guaranty could not be enforced against it if Zehr Wood was not in default at the time of [the assignment].

1. *Indian Village Shopping Ctr. Inv. Co. v. Kroger Co.*, 175 Ariz. 122, 125, 854 P.2d 155, 158 (App. 1993).

2. The parties stipulated to the amount of damages in this case.

(Emphasis added.) Diamond Z timely appealed.

## DISCUSSION

¶ 14 Diamond Z claims that the trial court erred in denying its motion for summary judgment because under Restatement § 48 it could not consent in advance to material modifications of the lease. Therefore, when Zehr Wood assigned its rights to Breaux Bridge, Diamond Z was discharged of its obligations under the guaranty contract. We review the trial court's denial of summary judgment de novo. *United Bank of Ariz. v. Allyn*, 167 Ariz. 191, 195, 805 P.2d 1012, 1016 (App.1990).

¶ 15 The common law recognized that the rights of a guarantor could be changed by actions of the primary parties to the debt transactions. The doctrines collectively known as "suretyship defenses" have developed to prevent the creditor ("obligee") from destroying the guarantor's ("secondary obligor") rights or diminishing its practical ability to enforce them. *See* Neil B. Cohen, *Striking the Balance: The Evolving Nature of Suretyship Defenses*, 34 Wm. & Mary L.Rev. 1025, 1033 (1993). At the same time, suretyship law has also deferred to freedom of contract and allowed the waiver of suretyship defenses. *Id.* at 1042.

¶ 16 Arizona law is well settled that surety rights can be waived by contract. *McClellan Mortgage Co. v. Storey*, 146 Ariz. 185, 188, 704 P.2d 826, 829 (App.1985); *see also Howard v. Associated Grocers*, 123 Ariz. 593, 596, 601 P.2d 593, 596 (1979); *Maestro Music, Inc. v. Rudolph Wurlitzer Co.*, 88 Ariz. 222, 230, 354 P.2d 266, 271 (1960); *Holmes v. Graves*, 83 Ariz. 174, 178, 318 P.2d 354, 357 (1957). The issue raised by Diamond Z, however, is one of first impression. There is no Arizona case law on point nor is

there an Arizona case that addresses the applicable provisions of the Restatement (Third) of Suretyship & Guaranty (1996). Accordingly, we look to the Restatement and other jurisdictions for guidance. *See Fort Lowell–NSS Ltd. P'ship v. Kelly*, 166 Ariz. 96, 102, 800 P.2d 962, 968 (1990).

¶ 17 Diamond Z claims that Restatement § 48 creates an inference that the suretyship defense regarding modification of the underlying obligation found in Restatement § 41(b)(i) cannot be waived or consented to in the guaranty agreement, because § 48 excluded the defense from its list of waivable defenses.[3] Diamond Z does not cite any legal authority that reaches such a conclusion. Indeed, without addressing the § 48 argument raised by Diamond Z, several jurisdictions have found that a guarantor that assents, either expressly or impliedly, to a modification of the underlying obligation is not discharged from its obligations under the guaranty. *See Mercy Med. Ctr., Inc. v. United Healthcare of the Mid–Atlantic, Inc.*, 149 Md.App. 336, 815 A.2d 886, 901–02 (2003), *review denied*, 374 Md. 583, 824 A.2d 59 (2003); *Sherwin–Williams Co. v. ASBN, Inc.*, 145 N.C.App. 176, 550 S.E.2d 527, 530 (2001), *review denied*, 355 N.C. 215, 560 S.E.2d 137 (2002); *Firstsouth, F.A. v. La Salle Nat'l Bank*, 699 F.Supp. 1248, 1251 (N.D.Ill.1988); *Baumgarten v. Bubolz*, 104 Wis.2d 210, 311 N.W.2d 230, 233 (Wis.Ct. App.1981); *see also* 38A C.J.S. *Guaranty* § 87 (1996). The Maryland Court of Special Appeals in *Mercy Medical* stated that "a change in a guarantor's obligation does not discharge him ... 'where the change is made in accordance with an express or implied provision ... contained in the principal contract' or 'in the contract of guaranty.'" 815 A.2d at 901–02 (quoting 38A C.J.S. *Guaranty* § 87).[4]

---

**3.** Section 48(1) states:

The secondary obligation is not discharged pursuant to § 39(c)(ii)-(iii), § 40(b), § 41(b)(ii), § 42(1), § 43, § 44 to the extent that, in the contract creating the secondary obligation or otherwise, the secondary obligor consents to acts that would otherwise be the basis of the discharge, agrees that such discharges are unavailable to the secondary obligor, or waives such discharges. Consent may be express or

implied from the circumstances. Such consent, agreement, or waiver, if express, may be effectuated by specific language or by general language indicating that the secondary obligor waives defenses based on suretyship.

**4.** *See also Woods–Tucker Leasing Corp. of Ga. v. Kellum*, 641 F.2d 210, 217 (5th Cir.1981) (finding no discharge where terms of guaranty expressly consent to modification); *Nikimiha Sec. Ltd. v. Trend Group*, 646 F.Supp. 1211, 1218

¶ 18 Diamond Z argues, however, that the general rule that a suretyship defense can be waived in advance has been modified by the new language of Restatement § 48(1). That section specifies that a guarantor may waive the discharge of its liability pursuant to sections 39(c)(ii)-(iii), 40(b), 41(b)(ii), 42(1), 43, and 44. Because the modification defense contained in § 41(b)(i) is not among those listed, Diamond Z concludes that the Restatement must be read as precluding its waiver in advance. As further support, Diamond Z points out that Tentative Draft No. 2 of the Restatement provided that all suretyship defenses could be waived. *See* Restatement (Third) of Suretyship § 42 cmt. a (Tentative Draft No. 2, 1993). The final Restatement ultimately revised what became § 48 and listed only certain sections and subsections.

¶ 19 It is not clear to us why Restatement § 48 excludes some of the surety defenses in its list of those that can be waived by consent. Neither party has provided us with the rationale of the drafters of the Restatement. Nor have they articulated any relevant differences between the defenses listed and not listed in § 48 that would allow only some to be waived.

■ ¶ 20 We do not find the failure to include certain surety defenses in § 48 sufficient to overcome the general principle that the parties to commercial transactions may generally structure their agreements as they see fit. Section 6 of the Restatement plainly states that "[e]ach rule in this Restatement stating the effect of suretyship status may be varied by contract between the parties subject to it." Indeed, comment a to Restatement § 6 plainly allows waivers to be included in the guaranty contract, i.e., in advance:

Suretyship law provides rules governing the relationship between various combinations of parties to a suretyship arrangement. If those parties prefer to order their relationship in a different way, suretyship law defers to that private ordering. Indeed, agreements to do so are quite common. . . . Agreements between the secondary obligor and the obligee as to the availability and scope of suretyship defenses are typically incorporated into the contract creating the secondary obligation.

¶ 21 Other Restatement provisions also reflect a general policy allowing waivers. Comment d to Restatement § 48 states that a guarantor can forego its suretyship defenses, "by agreement or waiver," and it can forego "the benefit of the rules in §§ 39–44 that might otherwise result in such discharges." This comment suggests that parties to a guaranty contract may waive *any* of the suretyship defenses found in Restatement §§ 39–44.[5] Section 37 of the Restatement generally describes all the suretyship defenses, including the modification contained in § 41(b)(i) and all the defenses listed in § 48. Comment e to § 37 specifically provides that the suretyship defenses listed in § 37 may be foregone by the guarantor. No attempt is made to distinguish between the different defenses.

¶ 22 Section 48 lists only some of the suretyship defenses as being waivable. It does not, however, go further and plainly preclude waiver of any others. Given the general policy that parties may contractually waive defenses, and absent any persuasive reason to treat the modification defense differently, we hold that Diamond Z could waive its suretyship defenses in advance.

(E.D.Pa.1986) (finding that novation did not discharge guarantor where an express provision within guarantee consented to reservation of rights); *Bank of Boston Int'l of Miami v. Arguello Tefel*, 644 F.Supp. 1423, 1429 (E.D.N.Y.1986) (holding that surety was not discharged by various modifications made without surety's consent where she waived her right to notice in loan agreement); *McGill v. Idaho Bank & Trust Co.*, 102 Idaho 494, 632 P.2d 683, 688 (1981) (finding guaranty liability based upon contractual waiver of the defense of release of the principal debtor); *Abadie v. Markey*, 710 So.2d 327, 330–31 (La. App.1998) (finding that terms of lease expressly waived surety's right to release due to modification); *Reliance Ins. Co. v. Penn Paving Inc.*, 557 Pa. 439, 734 A.2d 833, 839 (1999) (noting that a surety's consent to material modifications in the creditor-debtor relationship may be obtained as part of the suretyship contract).

5. Furthermore, even the Uniform Commercial Code recognizes that the effect of prior consent to material modifications of the underlying obligation does not discharge the surety. *See* U.C.C. § 3–605(i) (1999); A.R.S. § 47–3605(I) (1997).

¶ 23 This does not mean, however, that all rights may be waived. According to the Restatement, a party's freedom to contract to be a guarantor is still limited by principles of contract law such as unconscionability, good faith and fair dealing, and the statute of frauds. *See* Restatement § 6 cmt. b, § 48 cmt. a. None of these principles is controlling here.

¶ 24 Diamond Z argues that it is against public policy and unconscionable to allow the suretyship defense like the one described in § 41(b)(i) to be waived in advance. Diamond Z fails to explain why waiver of this particular defense would be against public policy or provide evidence that enforcing the waiver would be unconscionable. First, Diamond Z freely entered into the contract and it received an immediate payment of $375,000. Second, Diamond Z's legal counsel negotiated the contract. Although the terms of the guaranty contract favor Data Sales, this is not unreasonable under the circumstances, especially in light of the direct benefit Diamond Z received when it was paid the balance due on the tub grinder. Data Sales would only fund the purchase/leaseback transaction if Diamond Z agreed to sign a "bulletproof" guaranty. Requiring Diamond Z to consent in advance to certain modifications of the lease provided additional assurances that the terms would be satisfied. In a case such as this, where the guarantor received a direct business benefit and the guaranty was well-documented, we can find no public policy that would preclude enforcing the terms of the guaranty, including the consent and waiver provisions.

¶ 25 The language of the guaranty in section 1.3(b) expressly allows the lease to be amended without notice to Diamond Z and without its consent. Section 2.2 of the guaranty allows Data Sales to make several modifications to the lease, including acquiring or releasing collateral as well as substituting or releasing parties to the lease. The guaranty contract's language is unambiguous and we agree with the trial court that the contract gave Data Sales the authority to allow Zehr Wood to assign its rights and interests in the lease to Breaux Bridge without notice to or consent from Diamond Z.

¶ 26 Moreover, nothing in the language of the guaranty limits Data Sales' authority to exercise its rights under sections 1.3 and 2.2 to times when Zehr Wood was in default. Diamond Z correctly points out that its obligation was only triggered by the default of the principal obligor, but this fact does not help its arguments because Data Sales did not turn to Diamond Z until after Zehr Wood was in default. Data Sales' right to modify the lease could be exercised at any time after Diamond Z gave its consent, i.e., signed the guarantee.

¶ 27 To summarize, we agree with the trial court's interpretation of Restatement § 48 and hold that pursuant to Arizona law, surety defenses, including the defense found at Restatement § 41(b)(i), can be expressly or impliedly waived within the guaranty contract. Our ruling is consistent with Arizona case law, such as *Indian Village* and *McClellan Mortgage,* holding that most surety rights can be waived by contract. Accordingly, the trial court did not err by denying Diamond Z's motion for summary judgment.

¶ 28 Diamond Z also appeals the trial court's denial of its renewed motion for judgment as a matter of law ("JMOL"). Diamond Z claims that Data Sales offered no evidence that Diamond Z intended to waive its right to notice and consent of an assignment of Zehr Wood's interest in the lease.

¶ 29 We review the trial court's denial of a JMOL motion de novo. *Shoen v. Shoen,* 191 Ariz. 64, 65–66, 952 P.2d 302, 303–04 (App. 1997). "[W]e view the evidence and all reasonable inferences in the light most favorable to the nonmoving party." *Murcott v. Best W. Int'l, Inc.,* 198 Ariz. 349, 356, ¶ 36, 9 P.3d 1088, 1095 (App.2000). The trial court should grant the motion "if the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant." *Shoen,* 191 Ariz. at 65, 952 P.2d at 303; *see also* Ariz. R. Civ. P. 50(a)(1) (providing for judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue").

¶ 30 Through the witnesses presented at trial, each party established that there was disagreement over what the parties subjectively intended when they entered into the contract. Additionally, the parties presented the jury with testimony and exhibits establishing the surrounding circumstances. Both parties presented evidence of the parties' negotiations and prior dealings and each party's reasonable expectations as a result of the promises entered into in the guaranty. Finally, the jury had before it the plain language of the guaranty contract and the lease agreement. After reviewing all of the evidence presented to the jury, we cannot say that the jury unreasonably found in favor of Data Sales. It is not for us, nor for the trial court, to weigh the evidence or judge the credibility of witnesses. *A.R. Teeters & Assoc., Inc. v. Eastman Kodak Co.,* 172 Ariz. 324, 329, 836 P.2d 1034, 1039 (App.1992); *see also Orme School v. Reeves,* 166 Ariz. 301, 308, 802 P.2d 1000, 1007 (1990) ("[T]he trial judge will not weigh evidence or determine questions of credibility, will not draw an inference where conflicting inferences are possible, and will defer to the jury on all disputed material facts."). These are tasks for the jury. *Orme School,* 166 Ariz. at 308, 802 P.2d at 1007. We find that the evidence presented at trial supported the jury's verdict and affirm the trial court's denial of Diamond Z's renewed JMOL.

¶ 31 Next, Diamond Z appeals the trial court's refusal to include three of its requested jury instructions. As pointed out by Data Sales, and following our own independent review of the record, we find that Diamond Z did not make any objections to the jury instructions ultimately given by the court. Absent fundamental error, failure to object to a jury instruction waives the issue of error in the instruction. Ariz. R. Civ. P. 51(a); *Bradshaw v. State Farm Mut. Auto. Ins. Co.,* 157 Ariz. 411, 419–20, 758 P.2d 1313, 1321–22 (1988); *AMERCO v. Shoen,* 184 Ariz. 150, 161, 907 P.2d 536, 547 (App.1995). Fundamental error is that which "goes to the very foundation" of a case. *State Consol. Publ'g Co. v. Hill,* 39 Ariz. 163, 167, 4 P.2d 668, 669 (1931). "The doctrine of fundamental error is sparingly applied in civil cases, and only when the error 'deprives a party of

the right to a fair trial.'" *Czarnecki v. Volkswagen of America,* 172 Ariz. 408, 417, 837 P.2d 1143, 1152 (App.1991) (quoting *Maxwell v. Aetna Life Ins. Co.,* 143 Ariz. 205, 212, 693 P.2d 348, 355 (App.1984)). Based upon our review of the record, we find no fundamental error.

¶ 32 We also find no merit to Diamond Z's related complaints about the special verdict form. Because Diamond Z did not object to the court's verdict form, it waived its right to assert error and we find no fundamental error in the verdict form as submitted to the jury.

¶ 33 Finally, both Data Sales and Diamond Z request attorneys' fees on appeal. Section 2.2 of the guaranty provides for an award of attorneys' fees. A contractual provision for attorneys' fees will be enforced according to its terms. *First Fed. Sav. & Loan Ass'n of Phoenix v. Ram,* 135 Ariz. 178, 181, 659 P.2d 1323, 1326 (App.1982). Because we affirm the judgment in all respects, we grant Data Sales' request and reject Diamond Z's request for fees and costs. Accordingly, upon compliance with Arizona Rule of Civil Appellate Procedure 21, we award Data Sales its reasonable attorneys' fees and costs on appeal.

## CONCLUSION

¶ 34 We affirm the judgment of the trial court.

CONCURRING: JAMES B. SULT, Presiding Judge, and LAWRENCE F. WINTHROP, Judge.