# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 03-4334 & 04-1153

CINCINNATI INSURANCE COMPANY,

*Plaintiff-Appellant,*

*v.*

G. TIMOTHY LEIGHTON,

*Defendant-Appellee.*

_____

Appeals from the United States District Court
for the Central District of Illinois.
No. 01-1394—**John A. Gorman**, *Magistrate Judge.*

_____

ARGUED SEPTEMBER 14, 2004—DECIDED APRIL 8, 2005

_____

Before CUDAHY, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* The Cincinnati Insurance Company issued a financial responsibility bond guaranteeing that Dixie Management Group, Inc., would deliver to the State of Illinois taxes collected on sales of motor fuel at Dixie's truck stops. Cincinnati surrendered the bond amount to the state after Dixie incurred a substantial tax liability and declared bankruptcy; Cincinnati then brought this suit in diversity seeking indemnity from Timothy Leighton, a former Dixie executive who signed Dixie's bond

application as an individual indemnitor for Cincinnati but was fired from Dixie four years before Cincinnati paid on the bond. On cross-motions from the parties, a magistrate judge, presiding by consent, entered judgment as a matter of law for Leighton, and later denied Cincinnati's motion to vacate under Federal Rule of Civil Procedure 60(b). We affirm both decisions.

## I.

Leighton was the corporate secretary and executive vice president of Dixie, which operated several truck stops in Illinois. In December 1997, Dixie applied to Cincinnati for a "Financial Responsibility Bond for a Motor Fuel Distributor" guaranteeing Dixie's payment of the fuel taxes it collected. Illinois will not issue a license to sell fuel without such a bond. Leighton, in his capacity as executive vice president, signed a "Miscellaneous Bond Application" on behalf of Dixie. He and the other corporate officers, Mark and Kathy Beeler, also signed the application as individual indemnitors. Based on that application, Cincinnati issued a bond for $40,001, an amount determined by the Illinois Department of Revenue ("IDOR"). The bond transaction was brokered by Rodney Brent of Van Gundy Insurance, an independent agency that represents Cincinnati in central Illinois.

In the bond application Dixie and its three officers, as individual indemnitors, requested that Cincinnati become Dixie's surety "for any bond, including the extension or renewal thereof." Dixie and the individual indemnitors also certified their assent to nine paragraphs under the heading "Indemnity" that identify specific obligations of the parties. Three of those paragraphs are relevant here. In paragraph two, Dixie and the individual indemnitors agreed to indemnify Cincinnati "from and against any liability, loss, cost, attorneys' fees, and expenses whatsoever, including the

enforcement of this agreement" that Cincinnati "shall at any time sustain as surety or by reason of having been surety on this bond or any other bond" issued for Dixie. In paragraph six, Dixie and the individual indemnitors agreed to waive "notice of any change, alteration, or extension of any bond," and further agreed that their promise to indemnify Cincinnati extended to "any subsequent bond of any type" issued for Dixie. Finally, in paragraph eight, Cincinnati agreed that "this indemnity may be cancelled as to subsequent liability by an indemnitor upon 'Registered Mail' written notice" to Cincinnati's home office.

In April 1998, less than four months after issuing the bond, Cincinnati increased the bond amount to $100,000. Cincinnati provided IDOR with a "Change Rider" purportedly memorializing Dixie's agreement to the increased amount. Leighton's name, again in the capacity of executive vice president, appears on the signature line for Dixie. Cincinnati did not require Dixie or the individual indemnitors to execute a new bond application prior to issuing the change rider.

In December 1998, Dixie terminated Leighton under circumstances not disclosed in the record. The Beelers, who remained with Dixie, barred Leighton from all Dixie property and refused even to permit him back in the office to retrieve personal papers. Leighton immediately met with Brent, the Van Gundy agent, and told Brent that his relationship with Dixie had been severed; Leighton, however, did not write Cincinnati to terminate formally his indemnity of Dixie's financial responsibility bond.

In the fall of 1999, Cincinnati began the process of renewing Dixie's bond. Cincinnati wrote the Van Gundy agency in October 1999 requesting updated financial statements for Dixie, Leighton, and the Beelers; Cincinnati also requested that a new bond application be executed because it had not obtained one before increasing the bond amount to

$100,000. A Van Gundy employee, Ruth Hargis, returned Cincinnati's correspondence two weeks later after typing her own note at the bottom that Leighton no longer worked for Dixie. The next day, October 26, Cincinnati faxed Hargis a reply to her note: "It was our understanding that Timothy Leighton was a partner of Dixie Truckers. Was there a change in ownership structure? We used Leighton's financial status as part of our underwriting consideration for the bond. Please advise as to the status of the ownership structure." Hargis's answer is not in the record, nor is there any evidence in the record concerning Cincinnati's communications with Van Gundy and Dixie during the three months that followed.

In late January 2000, Dixie and the Beelers executed the new application and indemnity agreement, which contained identical terms as the 1997 agreement. Mark Beeler signed in his corporate capacity on behalf of Dixie, and both he and Kathy Beeler—but not Leighton—signed again as individual indemnitors. The Beelers, though, still had not supplied updated financial statements, and Cincinnati in early February threatened to cancel the bond. A month later, on March 6, 2000, Cincinnati sent IDOR notice that it was cancelling the bond effective in 60 days; that action apparently produced the desired financial statements because on March 15 Cincinnati notified IDOR that it was rescinding its cancellation notice.

What Cincinnati did not discover at the time, however, is that during 1999 Dixie had accrued significant arrears in its tax payments to the state. In May 2000, IDOR demanded that Cincinnati surrender the full amount of its bond to cover unpaid fuel taxes assessed for the period between November 1999 and March 2000. Cincinnati wrote Dixie and the Beelers in July, reminding them of their duty to indemnify Cincinnati and demanding that they create a cash reserve sufficient to cover Cincinnati's anticipated loss on the bond. IDOR contended that Dixie still owed $504,000,

and Cincinnati paid IDOR $100,000 in February 2002. By then Dixie and the Beelers had filed for bankruptcy.

Cincinnati then brought this lawsuit, naming as defendants the Beelers and Leighton. Cincinnati attached to its complaint a copy of the original 1997 bond application bearing Leighton's signature, along with a copy of the bond issued for $40,001. The insurance company also attached a copy of the partially executed April 1998 change rider bearing the signature of its own representative but no signature from anyone at Dixie. Cincinnati alleged that Leighton had executed the change rider, but the company could not locate in its records a copy of the fully executed document. Cincinnati claimed that the 1997 agreement, as amended by the change rider which increased the bond amount to $100,000, remained in force and demanded that the Beelers and Leighton indemnify the company for the bond amount and associated costs. The Beelers, because of the automatic stay arising from their bankruptcy peti-tion, *see* 11 U.S.C. § 362, were promptly dismissed without prejudice, leaving only Leighton to defend the suit. It is undisputed that prior to serving Leighton with its lawsuit Cincinnati had made no effort to seek indemnity from him.

Leighton denied liability. In answering the complaint, he explained that he lacked "sufficient knowledge to form a belief" as to whether Dixie had ever executed the change rider attached to Cincinnati's complaint. By way of affirma-tive defense, however, Leighton went further and contended that Cincinnati had given him "no notice whatsoever" of the change rider, and thus by trying to increase the bond amount without his knowledge had released him from the indemnity agreement.

Leighton later filed what he styled as a motion for judgment on the pleadings, advancing the affirmative defense from his complaint and also arguing that the renewal of the bond agreement in early 2000 acted as a

novation of the 1997 agreement. Cincinnati had not yet mentioned the 2000 renewal, so Leighton attached to his motion a copy of the new agreement and the related correspondence between Cincinnati and the Van Gundy agency. Cincinnati moved for summary judgment that same day. Cincinnati argued that Leighton could not defend that he lacked notice of the change rider because under paragraph six of the indemnity section of the 1997 agreement he had waived notice of changes to the bond. Cincinnati also argued that Leighton's only means of securing a release from his obligation to indemnify the insurance company was to send written notice of cancellation pursuant to paragraph eight of the indemnity section; since Leighton had not done so, Cincinnati argued that it was entitled to enforcement of the indemnity agreement.

Leighton and Cincinnati then exchanged responses to their respective motions. In defending against Cincinnati's motion for summary judgment, Leighton submitted his affidavit describing steps he took after his termination to alert Cincinnati that he no longer worked for Dixie and that he wished to cancel his liability under the 1997 agreement. According to the uncontroverted affidavit, on the same day he was fired, Leighton personally informed Van Gundy agent Brent about his termination. Brent, who represented himself to Leighton as an agent of Cincinnati, acknowledged during their meeting that he knew already from speaking with Mark Beeler that Leighton had been fired. Several weeks later, in January 1999, Leighton and Brent spoke again, and Brent promised to inform Cincinnati that Leighton had severed his relationship with Dixie. Brent assured Leighton that he was not required to take any further steps to secure a release from the indemnity agreement. In his affidavit Leighton also averred that in February 1999 he telephoned Cincinnati at its home office to discuss his coverage under Dixie's directors and officers' liability policy but was told that Cincinnati could not discuss the matter

because Leighton was no longer employed by Dixie. After that, Leighton said, Brent initiated another meeting in June 2000, explaining that Cincinnati was trying to collect unpaid insurance premiums from Dixie and wanted Brent to get from Leighton whatever helpful information he might have about Dixie. At that meeting Brent confirmed that he had told Cincinnati that Leighton no longer worked at Dixie, and once more assured Leighton that he had done all that was needed to be released from liability to Cincinnati.

For its part, Cincinnati responded to Leighton's motion for judgment on the pleadings by repeating its premise that Leighton had waived prior notice of the increased bond amount. Cincinnati also reasserted its position that Leighton's only means of ending the indemnity agreement had been to send written notice to its home office. The insurance company said little about Leighton's novation theory, except to reject it in general terms and contend that a novation would not release Leighton from liability for unpaid taxes that accrued in 1999 before the new bond agreement was executed. Cincinnati also replied to Leighton's response to its motion for summary judgment, asserting for the first time that the bond was increased because IDOR wanted the higher amount as a condition of licensing Dixie to sell fuel. Cincinnati repeated its allegation that Dixie agreed to the change rider, but the insurance company offered no supporting evidence. Nor did Cincinnati produce any evidence concerning its negotiations with Dixie or the Van Gundy agency about the increase.

In October 2003 the magistrate judge addressed both parties' motions in a single order, denying Cincinnati's and granting Leighton's. In ruling against Cincinnati, the court reasoned that the evidence at summary judgment was consistent with Leighton's theory that the renewal of Dixie's bond agreement in 2000 had acted as a novation of Leighton's promise to indemnify Cincinnati under the 1997 agreement, and thus the insurance company had not es-

tablished as a matter of law its right to recovery under the 1997 agreement. Then, in granting judgment for Leighton, the magistrate judge concluded as a matter of law that the increase in the bond amount to $100,000 was such a material change that it could not have been contemplated when Leighton agreed to the waiver provision in paragraph six of the indemnity section of the 1997 agreement, and that, indeed, the increase was so substantial that it altogether invalidated the indemnity provision of the 1997 agreement. The court, of course, was still unaware that Leighton's name appears on the change rider filed with IDOR in 1998.

Cincinnati timely moved to reconsider under Federal Rule of Civil Procedure 59. The insurance company disputed the court's view that Leighton could not have foreseen the degree of increase in bond amount effected by the April 1998 change rider when he agreed to the waiver of notice in paragraph six of the 1997 indemnity section. Cincinnati also contended that the court had erred in relying on Leighton's novation theory to defeat summary judgment because Leighton never pleaded novation as an affirmative defense or included a novation argument in his response to Cincinnati's motion for summary judgment (rather than in his own motion for "judgment on the pleadings"). On the same day it filed its Rule 59 motion, Cincinnati also moved for leave to amend its complaint. Cincinnati explained that it had obtained from IDOR a copy of the fully executed change rider bearing Leighton's signature. Cincinnati proposed to amend its complaint by substituting this copy of the change rider for the copy of the partially executed document submitted previously. Leighton opposed both motions.

In mid-November 2003, the magistrate judge issued a brief order denying Cincinnati's Rule 59 motion, reasoning that it mostly rehashed arguments already raised and rejected. Cincinnati then filed a motion to vacate the judgment under Federal Rule of Civil Procedure 60(b). Cincinnati argued that the presence of Leighton's name on IDOR's copy

of the April 1998 change rider refuted Leighton's contention that he lacked notice of the increased bond amount. According to Cincinnati, the magistrate judge in granting judgment for Leighton had relied heavily on Leighton's "patently false" representation that he was unaware of the change rider. Cincinnati asserted that it was entitled to relief because of Leighton's "fraud, misrepresentation, or other misconduct," and also because the company had been "certainly surprised to discover Defendant Leighton's signature on the original Change Rider" obtained from IDOR. Leighton responded to this motion by noting that Cincinnati had offered no evidence that Leighton signed the document, and by arguing that Cincinnati had no excuse for waiting to obtain the copy from IDOR until after judgment was entered.

The magistrate judge denied Cincinnati's motions to vacate and to amend the complaint. While expressing concern "with what in hindsight appear to be inaccurate assertions made by Leighton regarding his knowledge," the court reasoned that Cincinnati had offered no reason for waiting until after the entry of judgment to obtain a copy of the fully executed change rider. The court added, moreover, that the alternative basis for its ruling—novation—was "wholly unaffected" by what Cincinnati characterized as "new" evidence. And, the court added, Cincinnati's motion for leave to amend was "untimely and futile."

## II.

Cincinnati appeals from both the underlying judgment and the denial of its Rule 60(b) motion. The parties are in agreement that Illinois law governs the substantive issues in this case.

As an initial matter, we must determine the nature of the grant of judgment as a matter of law in favor of Leighton. Although the magistrate judge initially accepted Leighton's characterization of his motion as one for judgment on the

pleadings, it is clear to us that the court actually treated it as a motion for summary judgment. Cincinnati contests this view and argues that if the court did construe Leighton's motion as one for summary judgment then the court should have apprised Cincinnati of that fact consistent with Federal Rule of Civil Procedure 12(c). That rule provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent by such a motion by Rule 56." *See* Fed. R. Civ. P. 12(c); *Church v. Gen. Motors Corp.*, 74 F.3d 795, 798 (7th Cir. 1996).

Leighton's motion—which the magistrate judge himself characterized as a summary judgment motion when he later denied Cincinnati's Rule 60(b) motion—and Cincinnati's opposition plainly discuss matters that are not included in the pleadings and which the magistrate judge did not exclude from consideration. For example, Leighton's motion relies extensively on the attached copy of the 2000 bond application, which is not even mentioned in either the complaint or answer, and this newer application underlies one of the court's two bases for finding in favor of Leighton. Furthermore, both Leighton's brief in support of his motion and Cincinnati's response brief discuss correspondence between Cincinnati and Van Gundy from late 1999 and early 2000 that first appeared in the record as an attachment to Leighton's motion. Thus it is apparent that the parties and the court disregarded its literal title and addressed the heart of Leighton's motion, which went well beyond the pleadings. *See Byrne v. Nezhat*, 261 F.3d 1075, 1104 n.63 (11th Cir. 2001); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 547 (6th Cir. 2000).

Because we conclude that Leighton was really asking for summary judgment, what matters is whether the magistrate judge afforded Cincinnati notice and an adequate oppor-

tunity to respond, consistent with Federal Rule of Civil Procedure 56. Cincinnati insists it was blindsided, but we cannot see how. The fact that Cincinnati had filed its own motion for summary judgment—in which it maintained that no disputed issues of material fact existed—put it on notice that summary judgment for either party was a possibility. *See Advantage Consulting Group, Ltd. v. ADT Sec. Sys., Inc.*, 306 F.3d 582, 588 (8th Cir. 2002); *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 740 (7th Cir. 2002); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000); *Goldstein v. Fid. & Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 750-51 (7th Cir. 1996); *cf. Simpson v. Merch. Recovery Bureau, Inc.*, 171 F.3d 546, 549-50 (7th Cir. 1999). Moreover, Cincinnati does not argue that it lacked an adequate opportunity to respond to Leighton's novation defense, which is the only legal issue linked to the 2000 bond renewal that first surfaced in Leighton's motion. Instead, Cincinnati claims it was denied a chance to marshal evidence that Leighton indeed knew about the change rider. That contention is frivolous. Cincinnati knew when it filed suit that it didn't have a copy of the fully executed change rider, and it knew as soon as Leighton answered the complaint that the absence of his signature would be at the heart of his defense. But over the next five months Cincinnati made no move to obtain a copy with Leighton's signature and moved for summary judgment without ever getting one, gambling that Leighton's actual knowledge of the rider would prove immaterial given the waiver provision in paragraph six of the indemnity section of the 1997 agreement. That gamble, however, had everything to do with Cincinnati's own motion for summary judgment, and nothing to do with its ability to respond to the novation argument in Leighton's motion.

We thus turn to the court's ruling. The magistrate judge at times seems to suggest that Cincinnati cancelled Leighton's indemnity obligation by increasing the bond amount to $100,000 from $40,001 without telling him. But

our reading of the court's decision leads us to conclude that the magistrate judge actually reasoned that Leighton's awareness of the change rider was immaterial because, in the court's view, such a significant change in the underlying agreement was beyond the contemplation of the parties and could not be waived under paragraph six of the indemnity section of the 1997 bond aplication. Whichever position the court intended, however, cannot be reconciled with the language of the 1997 agreement or the Illinois law that we must look to in interpreting it.

If the magistrate judge thought the increased bond was significant because there was no evidence that Leighton agreed to the change, then the court's ruling turns on its willingness to elide paragraph six, in which Leighton waived "notice of any change, alteration, or extension of any bond." Although usually the obligations of a third-party guarantor are discharged when parties to a contract unilaterally effect a material change in their own relationship that also affects the potential liability of the guarantor, a guarantor is free to give prior consent to such modifications—which Leighton did by agreeing to paragraph six. *See Brzozowski v. Northern Trust Co.*, 618 N.E.2d 405, 410 (Ill. App. Ct. 1993); *see also Reliance Ins. Co. v. Penn Paving, Inc.*, 734 A.2d 833, 838 (Pa. 1999); *Data Sales Co. v. Diamond Z Mfg.*, 74 P.3d 268, 272 & n.4 (Ariz. Ct. App. 2003) (collecting cases). On the other hand, if the magistrate judge viewed Leighton's waiver in paragraph six as ineffective in view of the size of the increased bond amount, we find no support for the proposition that the increase from $40,001 to $100,000 was so great that it essentially nullified the 1997 agreement; the court cited no pertinent authority for this conclusion. *See IIT Diversified Credit Corp. v. Kimmel*, 508 F. Supp. 140, 143 (N.D. Ill. 1981) (holding guarantor liable despite dramatic increase in liability because changes fit within the plain terms of waiver clause); *Jacobson v. Devon Bank*, 351 N.E.2d 254, 256 (Ill. App. Ct. 1976) (same); *see also United*

*States v. Stump Home Specialties Mfg.*, 905 F.2d 1117, 1121 (7th Cir. 1990) (same rule under Indiana law). The waiver language in paragraph six unambiguously states that Leighton waived notice of "any change, alteration, or extension" in the underlying bond, which plainly includes the 1998 increase in the bond amount. Parties to such a guaranty contract are entitled to enforce its terms to the letter—including holding a party to its waiver of the consent to material alterations that may increase liability. *See Bank One, Springfield v. Roscetti*, 723 N.E.2d 755, 764 (Ill. App. Ct. 1999). We have warned parties of the binding nature of these waiver clauses before. *See Stump Homes Specialties Mfg.*, 905 F.2d at 1120 (stating that if guarantors had agreed to guaranty agreement's waiver provision "without consulting a lawyer and perhaps without even reading the agreement, that is their tough luck"). Leighton is presumed to have understood these clear terms when he signed the agreement. *See FDIC v. Rayman*, 117 F.3d 994, 998 (7th Cir. 1997). Accordingly, we reject the magistrate judge's conclusion that Leighton was released from liability when the original bond amount was increased to $100,000.[1]

---

[1]  Since we affirm the district court's judgment on other grounds, we do not wish to dwell on this point, but we pause to note our disagreement with our colleague's assertion that Illinois law is unresolved on this issue. Illinois courts have clearly and repeatedly held that a guarantor is free to waive notice or consent to material changes in a guaranty agreement, and that such waivers must be construed according to their plain terms. In each of the Illinois cases cited in the concurring opinion, the entity making the loan or issuing the indemnity agreement made a material change that increased the guarantor's liability or risk. In each case the guarantor had signed a contract with terms permitting the lender to make changes without providing prior notice or obtaining consent. And in each case the court held that the lender was entitled to rely on the clear terms of the contract allowing it

(continued...)

Nevertheless, we do agree with the court's alternate basis for holding that Leighton's indemnity obligation under the 1997 agreement was discharged: the renewal of the bond agreement in 2000 acted as a novation that terminated his liability. A novation is the substitution of a new obligation for an existing one, which is thereby extinguished. *Faith v. Martoccio*, 316 N.E.2d 164, 167 (Ill. App. Ct. 1974). The four elements of a novation, which the party establishing the defense must prove by a preponderance of the evidence, are: "[1] a previous, valid obligation; [2] a subsequent agreement of all the parties to the new contract; [3] the extinguishment of the old contract; and [4] the validity of the new contract." *Phillips & Arnold, Inc. v. Frederick J. Borgsmiller, Inc.*, 462 N.E.2d 924, 928 (Ill. App. Ct. 1984). For there to be a novation, the obligee must assent to the substitution and agree to release the obligor. *Id.* at 928-29. The obligee's assent need not be express, however, but may be implied from the circumstances of the transaction or the obligee's subsequent behavior. *Burnett v. W. Madison State Bank*, 31 N.E.2d 776, 780 (Ill. 1941).

Cincinnati does not challenge the validity of the 1997 and 2000 agreements under factors one and four, and instead

---

[1] (...continued)

to make the change. *See Roscetti*, 723 N.E.2d at 767 (guarantor held liable despite bank's discovery and failure to disclose debtor's involvement in check-kiting scheme because of provision waiving bank's obligation to inform guarantor of debtor's financial situation); *Brzozowski*, 618 N.E.2d at 410 (waiver provision sustained guarantor's liability despite debtor's sale of collateral that, if retained, would have covered full amount of guaranty); *Jacobson*, 351 N.E.2d at 256 (guarantor remained liable despite extension of maturity date of loan because of broad waiver provision). The fact that the change at issue was not an increase in the *principal amount* of obligation is not a critical factor, for in each case the change was every bit as material as a change in the amount of principal might be.

focuses on factors two and three. The insurance company argues that the express terms of the 1997 agreement prevent the 2000 renewal from acting as a novation. The company further contends that the record does not establish conclusively its intention to extinguish the 1997 agreement and replace it with the 2000 agreement. Finally, Cincinnati argues that even if a novation took place, Leighton must still indemnify it against any tax delinquency incurred by Dixie before the novation took place.

Cincinnati's first argument—that paragraph six of the indemnity section of the1997 agreement forecloses Leighton's novation defense—fails. As we have noted, paragraph six states that Leighton "waives notice of any change, alteration, or extension of any bond, and agrees that this indemnity shall cover any subsequent bond of any type for the applicant." To support its argument, Cincinnati cites to *Champaign Nat'l Bank v. Babcock*, 652 N.E.2d 848 (Ill. App. Ct. 1995), and *United States Fid. & Guar. Co. v. Klein Corp.*, 558 N.E.2d 1047 (Ill. App. Ct. 1989), two cases in which Illinois appellate courts held that a second agreement did not act as a novation because of contract language in the original agreement. Yet these cases do not help Cincinnati because in both, unlike this case, the first agreement expressly anticipated and rejected the possibility that a subsequent agreement could relieve the guarantor. In *Babcock*, the agreement provided that "no release of any person primarily or secondarily liable . . . shall affect the liability of any of the undersigned hereunder," and that the guaranty would "remain in full force and binding upon the undersigned until written notice of its discontinuance shall be received by the Bank." 652 N.E.2d at 850. In *Klein*, the agreement provided that the indemnitor "shall not be relieved of liability hereunder by any change, addition, substitution, continuation, renewal, extension, successor *or new obligation*." 558 N.E.2d at 1051 (emphasis added). By contrast, paragraph six does not encompass the situation of a release by subsequent

agreement, as Cincinnati says it does. Rather than speak to the effect that a subsequent *agreement* would have on Leighton's potential liability as indemnitor under the 1997 agreement, paragraph six addresses the application of the 1997 indemnification term to subsequent *bonds*, or changes in the existing bond. Thus the language of the 1997 agreement cited by Cincinnati does not eclipse the possibility of a release by novation.

We also disagree with Cincinnati's contention that issues of fact remain concerning whether it intended to release Leighton from his indemnity obligation under the 1997 agreement. Cincinnati reminds us that the magistrate judge purportedly denied its motion for summary judgment not because the evidence compelled a finding of novation but because "the circumstances create clear questions" about whether a novation took place. Yet Cincinnati nowhere illuminates what material facts it thinks are at issue or what contrary conclusion we should draw from the evidence. We think that the only reasonable construction of the undisputed facts consistent with Illinois law is that Leighton was released as an indemnitor by the creation of a substitute agreement.

At the time Cincinnati sent the Van Gundy agency a new bond application for the Beelers to execute in 2000, it knew that Leighton no longer worked for Dixie. Van Gundy employee Hargis had said as much in a typed note, and Cincinnati responded to Hargis in writing, acknowledging the change. Upon receiving this verification of Leighton's departure, Cincinnati expressed concern to Van Gundy: it had relied on Leighton's personal financial statement in issuing the original bond and wanted more information about the company's current ownership structure before renewing the bond. After that Cincinnati insisted upon updated financial statements from Dixie and the Beelers, and even gave notice that it was cancelling the bond when the Beelers dragged their feet. Cincinnati's actions support

the inference that it was now looking to only two indem-
nitors instead of three, and so it refused to proceed unless
the Beelers proved with their financial statements that the
two of them could sufficiently indemnify Cincinnati. More-
over, Cincinnati's behavior after Dixie defaulted on its tax
payments supplies further evidence that it deemed the 2000
bond renewal a release of Leighton. When IDOR moved to
forfeit the bond, Cincinnati inexplicably pursued the Beelers
but not Leighton, raising the obvious inference that the
insurance company understood the 2000 renewal as a nova-
tion of the original agreement.

Cincinnati offered no evidence from anyone involved in
the 2000 renewal process that the new agreement and its
smaller pool of indemnitors was not intended to supplant
the 1997 agreement, and so the only reasonable view of the
undisputed evidence is that the renewal was, as Leighton
argues, a novation. In fact, if the 2000 agreement was not
a substitute for the 1997 agreement, Cincinnati had no rea-
son to require it because the Beelers *and Leighton* would
have remained liable under the original agreement. *See
Utica Mut. Ins. Co. v. Vigo Coal Co.*, 393 F.3d 707, 713 (7th
Cir. 2004) (holding, under Indiana law, that second indem-
nity contract novated earlier contract, releasing indemnitor
who signed first but not second contract).

Authority from the Supreme Court of Illinois supports our
conclusion that the evidence here shows that the 2000
agreement was a novation. In *McLean County Bank v.
Brokaw*, 519 N.E.2d 453, 458 (Ill. 1988), a struggling farmer's
parents signed a series of loan guarantees to cover their
son's growing debt to a bank. They initially signed a $75,000
guaranty agreement when the son's debt was $133,000,
then signed a $100,000 agreement when the debt reached
$188,000, and so on. After the amount of guaranty had
reached $250,000, the son defaulted and the bank attempted
to enforce against his parents both their $250,000 guaranty
and the immediately prior guaranty, for $200,000. The court

held that the $250,000 guaranty agreement had replaced the $200,000 agreement, per the practice of the parties, and that the parents' obligations under the $200,000 agreement had been extinguished. Like the bank in *McLean*, Cincinnati seeks a windfall: the protection of both contracts when the circumstances indicate that only the most recent is enforceable. In *McLean*, the bank had sought a $300,000 guaranty before the son defaulted, which demonstrated that it did not truly believe that it was indemnified under both agreements for a total of $450,000. Here, Cincinnati betrays the argument that both indemnity agreements remain in force through its willingness to accept only the Beelers as indemnitors, and through its behavior after the 2000 agreement came into force.

Finally, Cincinnati argues that if there was a novation when the bond was renewed in early 2000, Leighton's "indemnity obligations would have remained in effect for claims and losses, if any, incurred or to be incurred in connection with bonds executed prior to that date." In other words, says Cincinnati, even if the 2000 agreement replaced the 1997 agreement, Leighton remains liable for Cincinnati's losses attributable to unpaid taxes that accrued prior to the novation. Cincinnati cites no authority for this contention, which runs counter to the definition of a novation, which, by its terms, discharges preexisting liability: "A novation occurs when a valid new contract or obligation is created and a valid existing contract or obligation is extinguished." *Klein*, 558 N.E.2d at 1051; *see also Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 148 (3d Cir. 1999) ("A novation bars revival of the preexisting duty."); *In re Newport Plaza Assoc., L.P.*, 985 F.2d 640, 644 (1st Cir. 1993) (stating as a general proposition that a novation discharges all the rights and obligations under the previous agreement); *Rose Acre Farms, Inc. v. Cone*, 492 N.E.2d 61 (Ind. Ct. App. 1986) (holding that employee's second bonus agreement that novated original bonus agreement relieved employer of

preexisting liability under first agreement). When Cincinnati first made a demand of Leighton, the contract binding Leighton was no longer effective. Therefore, Cincinnati's sole recourse was under the new agreement, to which Leighton was not a party.

All that remains is Cincinnati's challenge to the magistrate judge's denial of its Rule 59 and 60(b) motions. Both motions were premised on Cincinnati's belief that its eleventh-hour production of the fully executed change rider apparently bearing Leighton's signature changed everything and compelled judgment in its favor. Yet even if Leighton did sign the change rider—and we note that at oral argument, his counsel informed us that Leighton continued to disclaim having done so—this additional fact would have no bearing on the conclusion that Leighton was entitled to summary judgment because of a novation. For this reason, both motions were properly denied. For completeness, however, we observe that Cincinnati assumes far too much by asserting that Leighton's purported signature proves that he made "patently false and fraudulent statements" about whether he signed the change rider. Cincinnati offered no evidence that Leighton committed fraud in asserting that he did not remember ever signing the change rider. This is a plausible explanation, given that this litigation began four years after the change rider was executed and that Leighton had no access to his office or records during that time. Cincinnati may speculate to the contrary, but it offered no evidence that the signature is Leighton's or that Leighton lied by saying he did not remember signing the change rider.

## III.

For the foregoing reasons, the orders of the district court granting judgment for Leighton and denying Cincinnati's motion under Rule 60(b) are AFFIRMED.

WILLIAMS, *Circuit Judge*, concurring. I readily join the judgment of the court. In addition to joining the majority's discussion of the denial of Cincinnati's Rule 60(b) motion, I also join that part of the opinion holding that Leighton's obligation to indemnify under the 1997 agreement was discharged because the renewal of the bond agreement in 2000 acted as a novation that terminated his liability. I would affirm the district court's judgment as a matter of law in favor of Leighton on that basis. I thus feel there is no need to opine whether Illinois would find that language in the indemnity agreement could sustain Leighton's liability after Cincinnati increased, without notice, the amount of the bond from $40,001 to $100,000. *Cf. Disher v. Info. Res., Inc.*, 873 F.2d 136, 141 (7th Cir. 1989) ("We are reluctant to opine unnecessarily on questions of state law."); *Graphic Sales, Inc. v. Sperry Univac Div., Sperry Corp.*, 824 F.2d 576, 581 (7th Cir. 1987) ("As a federal court whose jurisdiction is based on diversity of citizenship, we are particularly hesitant to decide unsettled questions of state law unnecessarily.").

Illinois law remains unresolved on this issue, and although it might ultimately be settled as prescribed by the majority, Illinois may also decide that general language such as that agreed to by Leighton does not constitute consent to responsibility for more than double the amount stated in an agreement. *See Reliance Ins. Co. v. Penn Paving, Inc.*, 734 A.2d 833, 837-40 (Pa. 1999) (finding surety did not consent to change in bonding line from $200,000 to $5 million by agreeing to be responsible for "any said Bond or Bonds, or any other bonds, which may be already or hereafter executed on behalf of the Contractor" and agreeing that "no . . . change or extension in the terms of any Bond" would release the signator); *Bank of Terrell v. Webb*, 341 S.E.2d 258, 259-60 (Ga. Ct. App. 1986) (signing note stating holder could "compromise or extend or renew . . . for any period . . . any indebtedness evidenced thereby" did not constitute consent to increase in interest rate, reasoning that the language

"cannot be construed as being a general consent to all modifications"). Although the majority cites several Illinois cases, none holds a signator who agreed to be responsible for a definite amount liable for more than that amount. *Cf. Bank One, Springfield v. Roscetti*, 723 N.E.2d 755, 764 (Ill. App. Ct. 1999) (defendant signed unconditional, unlimited guaranty); *Brzozowski v. Northern Trust Co.*, 618 N.E.2d 405, 411 (Ill. App. Ct. 1993) (holding plaintiff responsible for amount explicitly agreed in the guaranty, "$38,000 plus the interest on such amount and plus all expenses hereinbefore mentioned"); *Jacobson v. Devon Bank*, 351 N.E.2d 254, 254-56 (Ill. App. Ct. 1976) (holding that broad language in a guaranty did not discharge the plaintiff from his obligations under the guaranty, but not holding guarantor responsible for more than the amount of the original guaranty). Therefore, I respectfully decline to join that part of the opinion that discusses this issue.

A true Copy:

     Teste:

                              _____
                              *Clerk of the United States Court of Appeals for the Seventh Circuit*