MURDOCK, Justice
(dissenting).
The main opinion concludes that the debt obligation from Dotson 10s, LLC, to Vision Bank (“Vision”) that is reflected in the terms of the confirmed plan of reorganization of Dotson 10s under Chapter 11 of the Bankruptcy Code (1) materially altered the obligations of Fred G. Eagerton and Nancy Eagerton under their guaranty contracts and (2) did so without their consent. The Eagertons’ guaranty contracts, however, reflect their consent, in advance, to the changes that were incorporated into the repayment terms under the plan of reorganization for Dotson 10s. I therefore respectfully dissent.
The Eagertons executed their respective guaranty contracts on December 10, 2004. The guaranty contracts guaranteed “to [Vision] the payment and performance of the debt, liability or obligation of [Dotson *311 10s] to [Vision] evidenced by or arising out of the following: LOAN # 78476 AND LOAN # 67423 and any extensions, renewals or replacements thereof (hereinafter referred to as the ‘Indebtedness’).” (Capitalization in original; emphasis added.) Loan number 67423 is not at issue in this appeal.[12] Thus, the remaining discussion will focus on the “debt, liability or obligation of [Dotson 10s] ... that ar[ose] out of ... LOAN # 78476 ... and any extensions, renewals or replacements thereof.” (Capitalization in original.)
The promissory note Dotson 10s gave Vision and that evidenced loan number 78476 is dated December 10, 2004 (“the December 2004 note”). The December 2004 note had a maturity date of December 9, 2007. The principal amount of the note was $598,363, and it bore interest at a fixed rate of 7% per annum until the note was paid in full, i.e., the 7% interest rate remained applicable even after the maturity date if Dotson 10s failed to pay off the loan at that time.[13] The note called for 36 monthly payments of principal and interest in the amount of $4,788.13 each and a “final payment of the entire unpaid balance of principal and interest” on December 9, 2007. Also, the December 2004 note provided that it was secured by a mortgage that was executed in connection with the loan (“the December 2004 mortgage”). The December 2004 mortgage contained a “dragnet clause,” which stated that the mortgage secured, in addition to the December 2004 note, “[a]ll future advances from [Vision] to [Dotson 10s] or other future obligations of [Dotson 10s] to [Vision] under any promissory note ... or other evidence of debt existing now or executed after this Security Instrument whether or not this Security Instrument is specifically referenced.” (Emphasis added.)
On December 9, 2007, loan number 78476 was renewed pursuant to a “Multipurpose Note and Security Agreement” (“the MNSA”); the main opinion refers to the loan evidenced by the MNSA as “the original loan.” The MNSA specifically states that “THE PURPOSE OF THE LOAN IS: RENEWAL” (capitalization in original), and the MNSA continued to bear loan number 78476. The MNSA had a maturity date of December 9, 2010. The principal amount due under the MNSA was $550,677.53, and, like the December 2004 note, it bore interest at a fixed rate of 7% per annum.[14] Unlike the December 2004 note, however, the post-maturity rate of interest was 18%. The MNSA called for 4 monthly payments of interest only, followed by 31 monthly payments of principal and interest in the amount of $4,788.13 each, and a “final payment on December 9, 2010 of all remaining principal and interest of $501,774.93.” The MNSA also referenced the December 2004 mortgage as securing the obligations of Dotson 10s under the MNSA.
The Eagertons did not argue to the trial court, and they do not argue to this Court, that the extension of the maturity date and *312 other changes in the terms of the December 2004 note, as reflected in the MNSA, were material changes that voided their obligations under their guaranty agreements.
Dotson 10s defaulted on its obligations under the MNSA, and in May 2009 Vision filed the present action against Dotson 10s, John W. Dotson, Jr., Elizabeth E. Dotson, and the Eagertons. A few days later, Dotson 10s filed its bankruptcy petition in the United States Bankruptcy Court for the Southern District of Alabama, and, in August 2009, it filed a proposed plan of reorganization with the bankruptcy court.
Dotson lOs’s proposed plan of reorganization addressed Vision’s claims relating to loan number 78476 and another loan Vision had made to Dotson 10s, which the main opinion defines as “the second loan.” The second loan was initially evidenced by a note executed in October 2006 and subsequently by a renewal note executed in December 2008. The second loan, as renewed in December 2008, was in the principal amount of $222,513.56 and bore interest at the fixed rate of 8% per annum. The principal and interest were “repayable in 23 equal installment payments, amortized over 240 payments, in the amount of $1,877.17 each, commencing January 11, 2008, ... and one final payment consisting of ... the principal and all accrued interest remaining due and payable” on December 11, 2010. The Eagertons’ guaranty contracts did not apply to the obligations under the second loan. The second loan was, however, secured by a mortgage that was executed when the loan originated in October 2006 (“the October 2006 mortgage”) and also, based on the dragnet clause in the December 2004 mortgage, by the December 2004 mortgage. Further, I note that the October 2006 mortgage, like the December 2004 mortgage, contained a dragnet clause. As a result of the dragnet clauses in both the December 2004 mortgage and the October 2006 mortgage, both mortgages secured both loan number 78476 and the second loan.
As to Vision’s claims under loan number 78476 and the second loan, the proposed plan of reorganization for Dotson 10s provided:
“C. SECURED CLAIMS.
“Class Three: Allowed Secured Claim of Vision Bank
“This Class consists of the Allowed Secured Claim of Vision Bank, which claim is secured by 6.5 acre parcel where the clubhouse, tennis courts and swimming pool exist. The two notes comprising this claim and totaling approximately $823,411 will be combined and paid at 6% in equal monthly installments of $5,900 beginning 30 days after confirmation. The notes will be paid in full within 240 months. This class is impaired. [Dotson 10s] will keep the property insured with a policy of hazard insurance from a reputable company and will show proof of insurance to Vision Bank. Vision Bank will retain its lien on the subject property until the debt is paid in full.”
In other words, the proposed plan would have reduced the interest rate applicable to loan number 78476 and the second loan; it would have extended the maturity date of both loans from December 9, 2010, and December 11, 2010, respectively, to sometime after August 2019; and it would have reduced the combined installment payments due under those loans from $6,665.30 per month ($4,788.13 per loan number 78476 and $1,877.17 per the second loan) to $5,900 per month.
Vision initially objected to Dotson lOs’s proposed plan of reorganization, but at the December 1, 2009, bankruptcy court hearing concerning the plan, Vision and Dotson 10s agreed to an amendment to the plan.
*313 The terms of the amendment were included in the bankruptcy court’s December 10, 2009, order confirming Dotson lOs’s plan of reorganization.[15] The order states, in pertinent part:
“(1) [Dotson 10s] shall pay $20,000 in cash or certified funds to Vision Bank before 5:00 p.m. December 1, 2009 to cure the arrears in adequate protection payments previously ordered. (2) The secured claim of Vision Bank is determined to be $795,908.84 as of December 1, 2009. (3) [Dotson 10s] shall pay the secured claim to Vision Bank in equal monthly payments of $6,172.64 per month beginning January 1, 2010. Interest is calculated at 7% per annum. The debt to Vision Bank shall mature and become fully due and payable on January 1, 2012. (4) [Dotson 10s] shall have no grace period. If any payment is not paid on or before the due date, the automatic stay shall terminate and Vision Bank is authorized to immediately foreclose its mortgage without further order of this Court.”
When compared to the terms applicable to loan number 78476 and the second loan, the terms of the confirmed plan of reorganization resulted in (1) a debt with the same interest rate as the rate applicable to loan number 78476 and a lesser interest rate as to the second loan, (2) an approximately two-year extension of the maturity date applicable to the debt; and (3) a reduction in the combined installment payments applicable to the debt from $6,665.30 per month ($4,788.13 per loan number 78476 and $1,877.17 per the second loan) to $6,172.64 per month. Because loan number 78476 and the second loan were secured by the same mortgages, and because the promissory notes evidencing loan number 78476 and the second loan included cross-default provisions,[16] it does not appear that the collateral position of Vision was enhanced, or that the Eager-tons suffered any additional detriment to their legal rights, by the treatment of the loans as a single debt for purposes of the repayment terms under the plan of reorganization. Perhaps more important, however, is that, pursuant to the terms of their respective guaranty contracts, the Eager-tons consented in advance to the changes that are reflected in the repayment terms of the plan.
Although it is true that “[t]he general rule is that ‘[a] guarantor is discharged if, *314 without his or her consent, the contract of guaranty is materially altered,’ ” 99 So.3d at 305-06 (quoting 38A C.J.S. Guaranty § 97(2008)),

“[a] guarantor may consent in advance to a course of conduct which would otherwise result in his or her discharge. The guarantor is not released where the change is made in accordance with an express or implied provision contained ... in the contract of guaranty....

“A guarantor is free to waive notice or consent to material changes in a guaranty agreement.”

38A C.J.S. Guaranty § 96 (2008)(emphasis added). Indeed, as one well recognized treatise states: “[TJhe general rule calling for the discharge of a surety does not apply where the suretyship or guaranty agreement itself permits the modification of the underlying obligation.” 23 Richard A. Lord, Williston on Contracts § 61:31 (4th ed.2002)(emphasis added); see also, e.g, Cincinnati Ins. Co. v. Leighton, 403 F.3d 879, 886 (7th Cir.2005) (“Although usually the obligations of a third-party guarantor are discharged when parties to a contract unilaterally effect a material change in their own relationship that also affects the potential liability of the guarantor, a guarantor is free to give prior consent to such modifications.”); Bumila v. Reiser Homes of Maine, Inc., 696 A.2d 1091, 1094 (Me.1997) (“[W]here, as here, the guaranty contract contemplates the alteration that the guarantor complains of, there is no discharge.”).
The Eagertons’ respective guaranty contracts guaranteed “to [Vision] the payment and performance of the debt, liability or obligation of [Dotson 10s] to [Vision] evidenced by or arising out of the following: LOAN # 781.76 ... and any extensions, renewals or replacements thereof (hereinafter referred to as the ‘Indebtedness’).” (Capitalization in original; emphasis added.) The terms of the confirmed plan of reorganization reflect a combined payment scheme as to two debts owed by Dotson 10s to Vision; one of these is a “debt, liability, or obligation” “arising out of’ “LOAN # 78476” or an “extension, renewal or replacement thereof.” Although Vision and Dotson 10s agreed to the terms reflected in the confirmed plan of reorganization, they did not, in so doing, change the origins of the underlying debts, liabilities, or obligations of Dotson 10s to which the plan refers. Most of Vision’s claim under the plan of reorganization still “arisfes] out of” the “debt, liability, or obligation” reflected by “LOAN # 78476,” or an “extension, renewal or replacement” of that loan, and, in fact, the terms of the plan itself could be considered an “extension, renewal or replacement” of “LOAN # 78476,” albeit with the inclusion of additional debt from another loan, i.e., the second loan, as to which the Eagertons have no liability.[17]
*315 In addition to the foregoing, the Eager-tons’ respective guaranty contracts state:
“6. ... The liability of the [Eager-tons] shall not be affected, or impaired by any of the following acts or things (which Lender is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this guaranty, without notice to or approval by the [Eagertons]): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any and all Indebtedness; (ii) any one or more extensions or renewals of Indebtedness (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Indebtedness,”
(Emphasis added.)
The agreement between Vision and Dotson 10s, as reflected in the repayment terms of the plan of reorganization, falls within Vision’s rights under the foregoing provision. The Eagertons agreed that Vision needed no approval from them concerning any “extension or renewal” of the “debt, liability, or obligation” “evidenced by or arising out of’ “LOAN # 78476” or an “extension, renewal or replacement thereof.” Indeed, the Eagertons agreed in their guaranty contracts that Vision needed no approval from them concerning “any modification of the interest rates, maturities or other contractual terms applicable to any” “debt, liability, or obligation” “evidenced by or arising out of ’ “LOAN # 78)76” or “any extensions, renewals or replacements thereof.”
Further, the Eagertons’ guaranty contracts were “absolute, unconditional and continuing guarantees] of payment.” Paragraph 6, which is quoted above, continues by stating that the Eagertons’ liability would not be “affected or impaired by ... (vii) any foreclosure or enforcement of any collateral security; ... [or] (ix) any order of application of any payments or credits upon Indebtedness.” Indeed, the Eagertons expressly agreed in paragraph 11 of their respective guaranty contracts that Vision “shall not be required first to resort for payment of the Indebtedness to Borrower ... or first to enforce, realize upon or exhaust any collateral security for Indebtedness, before enforcing this guaranty.” (Emphasis added.) Also, in paragraph 10 of their respective guaranty contracts, the Eagertons
“waive[d] any claim, remedy or other right [the Eagertons] may now have or hereafter acquire against [Dotson 10s] ... arising out of the creation or performance of [the Eagertons’] obligation[s] under this guaranty, including any right of subrogation, contribution, reimbursement, indemnification, ... and any right to participate in any claim or remedy [the Eagertons] may have against [Dotson 10s] [or] collateral ... whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.”
Nothing in the Eagertons’ guaranty contracts, or in any of the documents discussed above as to the obligations of Dotson 10s arising out of loan number 78476, gave the Eagertons the right to insist that the proceeds from a foreclosure be applied in any particular manner or that their legal rights be preferred in some manner as to those of Vision.[18] Indeed, as is usual *316 in the context of guaranty contracts, virtually the entire contract speaks in terms of the rights of the lender, i.e., Vision, and the protection of those rights, as against any rights of the guarantors, i.e., the Ea-gertons, or the borrower, i.e., Dotson 10s.

. It appears that loan number 67423 already existed in December 2004 and that the outstanding balance due under that loan was partially refinanced as part of loan number 78476. The remaining balance due under loan number 67423 was renewed. The renewed loan number 67423 was eventually paid in full by Dotson 10s.

. The purpose of the December 2004 note was to refinance two loans (loan number 67245 and loan number 77437) and, as noted above, to partially refinance the outstanding balance due under loan number 67423. The balances that were due under the refinanced loans are not disclosed by the record.

.The principal amount of the MNSA closely approximates the principal balance that remained due on the maturity date of the December 2004 note, i.e., December 9, 2007.

. The Eagertons offered affidavits in support of their motion for a summary judgment. In the affidavits, they averred:
"3. We were not parties to the bank-ruptcyproceeding filed by Dotson 10s, LLC. We were not notified — by Vision Bank or anyone else — that Dotson 10s, LLC had filed a bankruptcy proceeding. We did not participate in that bankruptcy proceeding. We did not consent to the bankruptcy plan filed by Dotson 10s, LLC. In fact, we were not given the opportunity to consent to or object to the bankruptcy plan. No person from Vision Bank notified us that Vision Bank was agreeing to Dotson 10s, LLC’s bankruptcy plan.”
Vision did not challenge these averments; thus, I consider them to be admitted for purposes of this writing. Nevertheless, I note that the proposed plan of reorganization specifically named the Eagertons as being among Dotson lOs’s "Class Five” creditors; it even described them as possessing a claim for $80,000. The proposed plan further stated that "Classes Three (Vision Bank), Four (General Unsecured Creditors), and Five (Unsecured Claims of Principals and Insiders) are impaired. Class Five creditors consent to the plan.” (Emphasis added.) Also, the bankruptcy court’s order confirming the plan states that the plan was "transmitted in accordance with applicable law to the creditors and all parties in interest whose acceptance is required by law.”

. As to each loan, the promissory note contained language to the effect that the failure of Dotson 10s "to pay, or keep any promise, on any debt or agreement [it had] with [Vision]" was a default under that promissory note.

. The actions taken by Vision and Dotson 10s also are in line with the general tenor of the Eagertons' guaranty contracts. The contracts state that "[t]he liability of the Undersigned hereunder shall be limited to a principal amount of $648,363.00,” but that “Indebtedness may be created and continued in any amount, whether or not in excess of such principal amount, without affecting or impairing the liability of the Undersigned hereunder.” (Emphasis added.) The latter quoted passage clearly authorizes Vision and Dotson 10s to create a principal amount of "Indebtedness” in excess of the principal amount of the Eagertons' guaranty obligations. In other words, Vision and Dotson 10s could both continue the debt obligations as referenced in the guaranty contracts and “create” debt obligations over and above what existed at that time, even obligations in excess of the principal amount of the Ea-gertons’ obligations. As to that excess prin *315 cipal amount, however, and any interest or charges associated with the excess amount, the Eagertons would have no liability.

. Paragraph 4 of the Eagertons’ guaranty contracts acknowledges that Dotson 10s might have debt obligations to Vision that exceeded the principal amount of the Eager- *316 tons’ respective guaranties. See note 17, supra. Paragraph 4 continues:
“[Vision] may apply any sums received by or available to [Vision] on account of the Indebtedness from [Dotson 10s] ... out of any collateral security or from any other source to payment of the excess. Such application of receipts shall not reduce, affect or impair the liability of the Undersigned hereunder.” (Emphasis added.) Neither this provision nor any other provision of the Eagertons’ guaranty contracts gives the Eagertons an affirmative right to require Vision to apply proceeds from any collateral to any part of a debt obligation or to any particular debt obligation.